## In re GRAND JURY INVESTIGATION.

District Court, M. D. North Carolina,
Winston Salem Division.
March 30, 1940.

On Reargument April 12, 1940.

Winston Salem, N. C., Thomas H. Willcox, of Norfolk, Va., Brooks, McLendon & Holderness, of Greensboro, N. C., C. B. Shaw, of Chicago, Ill., Brooks, McLendon & Holderness, of Greensboro, N. C., and Blake, Stim & Curran, of New York City, for Movants.

Carlisle W. Higgins, U. S. Atty., of Greensboro, N. C., Charles C. Pearce, Sp. Asst. to Atty. Gen., of Washington, D. C., John W. Aiken, Sp. Asst. to Atty. Gen., of Hickory, N. C., Thomas M. Logan, Sp. Asst. to Atty. Gen., of Covington, Ky., H. Lynden Schilz, Sp. Asst. to Atty. Gen., of Washington, D. C., Edward Dumbauld, Sp. Atty., of Uniontown, Pa., David Fields, Sp. Atty., of Sharon, Pa., Hal T. Gibson, Sp. Atty., of Chattanooga, Tenn., William H. Glenn, Sp. Atty., of Racford, N. C., Ben R. Tillman, Sp. Atty., of Edgefield, S. C., and Edwin A. Sheehan, Sp. Atty., of Washington, D. C., for the United States.

HAYES, District Judge.

The subpoenas duces tecum [1] served upon each movant are identical and were served on the custodian of corporate records at its home office and at numerous branch offices. The motions are to quash and vacate all of the subpoenas for that: (a) The subpoena constitutes an unlawful and unreasonable search and seizure in violation to the Fourth Amendment to the United States Constitution;

(b) The subpoena is an improper and unwarranted investigation of and excursion into the private affairs of the corporation in question and does not constitute a demand for the production of relevant evidence but is an attempt to discover evidence by search and seizure of a great mass of documents and papers;

(c) The subpoena is too general, broad and indefinite in its terms and too extensive in time and compliance therewith would be oppressive, and to require it would be an abuse of the power of the court;

(d) It is unreasonable and invalid because:

(1) It calls for information and not specific documents,

(2) It would compel party in question to go through innumerable files and papers to determine which relate to the subjects enumerated involving oppression and unreasonable burden;

(3) There is no showing of materiality or pertinence of the papers to any issue

David Peck (of Sullivan & Cromwell), of New York City, J. Erle McMichael, of Winston Salem, N. C., Roy H. Callahan (of White & Case), of New York City, Ratcliff, Hudson & Ferrell, of Winston Salem, N. C., R. F. Feagans, of Chicago, Ill., Hammond Chaffetz, of Washington, D. C., Manly, Hendren & Womble and W. P. Sandridge, all of Winston Salem, N. C., E. Randolph Williams and Wirt P. Marks, Jr., both of Richmond, Va., Roy L. Deal, of

---

[1] See note at end of opinion.

which the Federal Grand Jury has jurisdiction to consider.

(4) Asks for documents without regard to whether they relate to interstate or intrastate actions;

(e) Enforcement of the subpoenas without any showing of materiality of the documents and without any showing of jurisdiction constitutes an unlawful search and seizure in violation of the Fourth Amendment.

(f) And deprives the corporation of its property without due process in violation of the Fifth Amendment.

Affidavits in support of, and in opposition to, the motions have been filed from which it appears that in the District Court of the United States for the District of Maryland during the ·year 1926 all of the petitioners except Cudahy Packing Co. entered pleas of nolo contendere to an information charging them and others totalling 39 with a violation of the Sherman Act (15 U.S.C.A. § 1 et seq.) and in which fines aggregating $90,500 were imposed; that continuous complaints of monopolistic and restraint of trade and commerce practices in the fertilizer industry were made by farmers, farmer's cooperatives, fertilizer agents, dealers and mixers to the Attorney General and to the United States Attorney; that agents of the F. B. I. had conducted extensive investigations into the records of the movants except Cudahy Packing Co. during 1939 and that from the preliminary investigation it was found that the price of various grades of fertilizers had been maintained with such uniformity as to corroborate the complaints and to make a thorough investigation necessary; identical and uniform prices are charged by widely separated groups connected with the industry; the annual sales of fertilizer and fertilizer products aggregate $200,000,000 and the quantity used approximates eight million tons a year; that the Attorney General, after an examination of the data supplied by those engaged in the industry, directed a grand jury investigation to determine whether a conspiracy or combination in restraint of trade or commerce exists and agreeably to the statutes a special grand jury was convoked at Winston Salem, N. C., on February 12, 1940, and is still engaged in the ·investigation; this investigation is conducted in good faith to determine whether any persons or corporations engaged in the fertilizer industry are violating the Sherman Anti-Trust Act and amendments thereto.

With the exception of Cudahy Packing Co., all of the petitioners permitted agents of the F. B. I. to investigate their records and in some instances agents were engaged as long as eight months; they copied many records.

Many factors enter into the fixing of prices for fertilizer. The industry is a heavy chemical industry—the largest having to do with heavy chemicals—embracing allied and subordinate industries as potash, nitrogen, phosphate, rock, sulphur, sulphuric acid, super phosphate, nitrate of soda, sulphate of ammonia,· nitrogen solutions, cynamide, fish scrap, leather scrap, tankage, organic ammoniates, fertilizer bags, etc.

The documents called for embrace an enormous volume, will require much time and expense to assort and assemble and will be very burdensome. With the exception of Cudahy Packing Co., Swift and Co. and Armour and Co. of Delaware and Illinois, the fertilizer industry and allied industries constitute the business of the petitioners and the production of all of the documents would virtually divest these companies of their files. The fertilizer and kindred industries constitute but a small part of Cudahy, Swift and Armour.

A subpoena identical with those here under consideration was approved by Judge Hulbert in the Southern District of New York, In re Investigation by Atty. Gen., (In re Cudahy Packing Co.), 27 F.Supp. 997, but an appeal was taken from his ruling. The Government challenged the procedural right to an appeal from an interlocutory order. The Circuit Court held the matter was appealable, In re Cudahy Packing Co., 2 Cir., 104 F.2d 658, but the United States Supreme Court in Cobbledick et al. v. United States, 60 S.Ct. 540, 84 L.Ed. ——, decided February 26, 1940, held such orders interlocutory and not appealable. In the meantime the grand jury had' been dismissed and by consent Judge Hulbert's order was vacated.

A corporation must submit its books and papers to duly constituted authority when demand is suitably made. When the demand is by lawful process which confines its requirements within limits which reason imposes in the circumstances of the case, a corporation has no right to refuse. Wilson v. United States, 221 · U.S. 361,

31 S.Ct. 538, 55 L.Ed. 771, Ann.Cas.1912D, 558.

■ A subpoena duces tecum is a "process" within the meaning of the Fourth Amendment, whose validity is tested by its reasonableness in the circumstances of the case. Essgee Co. v. United States, 262 U.S. 151, 43 S.Ct. 514, 67 L.Ed. 917; Brown v. United States, 276 U.S. 134, 48 S.Ct. 288, 72 L.Ed. 500. In a grand jury investigation of practices by the fertilizer industry to ascertain if there exist combinations in restraint of interstate commerce, to fix prices of fertilizer, and to stifle competition, what books, letters, telegrams and documents of a fertilizer company would be reasonably essential to such an inquiry? The grand jury needs to determine the basis upon which prices are fixed: the cost of the material composing the product, the manufacture and mixing, the transportation and sale. The exchange of data with other companies similarly engaged and communications relating thereto are material on an inquiry of price fixing. If a conspiracy was formed for such unlawful purposes more than three years prior to the institution of the proceeding, the activities of the conspirators as disclosed by the corporate records constitute an appropriate inquiry by the grand jury. Since 39 companies— some of the movants here being included— entered pleas to nolo contendere to similar charges filed in December 1926, the transactions as embodied in the records of the companies showing a continuation of unlawful practices would be material.

It is suggested that the documents called for are voluminous and would require much time and expense to assemble and produce. During the oral argument when the court was more favorably impressed with the soundness of the position by petitioners, the court suggested a conference among petitioners during the noon hour and a report to the court consenting for two attorneys on the Attorney General's staff at Winston Salem to visit the offices of the petitioners and there select from the records named in the subpoena only those records actually material before the grand jury and thereby avoid the recognized inconvenience and expense to the petitioners by complete compliance. However, the petitioners remained silent. Had they given their consent the court would have required the United States to examine the records called for in the office of the petitioner instead of requiring them produced in Winston Salem. The petitioners, however, stood upon their constitutional rights as was their privilege.

Commerce between the states and foreign states is essential to our national peace and prosperity. The web of commercial life has been so intricately woven that our business structure would collapse without the proper functioning of corporate enterprise. It is desirable to expand this enterprise and to make our commerce healthy and thrifty. The great majority of corporate officials seek earnestly for enlightenment on the manner and means of conducting their business legitimately and to this end employ advisedly, able counsel. But we must not lose sight of the fact that our constitution contemplates governmental control over interstate commerce, whether carried on by corporations or individuals. In the opinion of Congress that commerce will thrive best when its flow is free. There is no power or consideration which should outweigh the province of Congress to preserve the free flow of commerce. Combinations in restraint of trade, conspiracies to fix prices, to stifle competition, are denounced by Congress as dangerous to the continuity of sustained commerce. If commerce is destroyed by commercial combinations the disastrous results of depression—the sting of which is still fresh in the minds of all Americans—soon will undermine the sacred securities of the Bill of Rights to the misfortune of private citizens and corporate entities. The Bill of Rights will endure so long as we do not suffer our commerce to be destroyed. When considering the application of the protection of the Fourth Amendment to corporations not only engaged in, but actually controlling, a single indispensible industry in agriculture, the scope of a grand jury investigation, the apparent necessity for it in the public interest, the inquiry necessary to determine the actual conditions, the fact that such an unlawful combination has heretofore been alleged by the United States against a number of the movants who entered pleas of nolo contendere and paid fines, are to be carefully considered in determining the reasonableness of the scope of the subpoena duces tecum. "Although the object of the inquiry may be to detect the abuses it has committed, to discover its violations of law, and to inflict punishment by forfeiture of franchises or otherwise, it [a private corporation] must submit its books

and papers to duly constituted authority when demand is suitably made." Wilson v. United States, supra [221 U.S. 361, 31 S.Ct. 545, 55 L.Ed. 771, Ann.Cas.1912D, 558].

Even in Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652, upon which all of the movants rely, wherein the subpoena was then condemned as violative of the Fourth Amendment, it is said at page 77 of 201 U.S., 26 S.Ct. at page 380, 50 L.Ed. 652: "Doubtless many, if not all, of those documents may ultimately be required, but some necessity should be shown, either from an examination of the witnesses orally, or from the known transactions of these companies with the other companies implicated, or some evidence of their materiality produced, to justify an order for the production of such a mass of papers." Other cases in which the subpoena was held objectionable are Bank of America, etc., v. Douglas, 70 App.D.C. 221, 105 F.2d 100, 123 A.L.R. 1266, opinion by Judge Groner, Federal Trade Commission v. American Tobacco Company, 264 U.S. 298, 44 S.Ct. 336, 68 L.Ed. 696, 32 A.L.R. 786.

■ Applying the tests deduced from the authorities, it has been sufficiently shown that the records of the movants are material and necessary for the inspection by the grand jury in its investigation of alleged violations of the Anti-Trust laws. That the former conviction of some of the movants and the present practices disclosed by an investigation of their records by agents of the F. B. I. and the indicia of strict and rigid price maintenance by those engaged in the industry in widely separated areas and absence of signs of competition are sufficient to meet the requirements of Hale v. Henkel, supra. Assuming that the grand jury has the power to have produced all of the documents called for, such power should not be employed except where there is reasonable necessity to resort to it. Governmental and judicial power ought to be sparingly employed and never when the action is unsupported by reason, fairness and justice. Improper use of power engenders disrespect for authority and undermines faith in that authority which is essential to the preservation of law and order. The subpoena ought to be reasonably specific and to call for records only reasonably necessary and avoid, as far as possible, any unnecessary burden or expense on those who are compelled to comply with the

process of the court. This court assumes that the information sought, if supplied, will be used only in connection with the criminal investigation. Any other use would be violative of the spirit and purpose of this ruling.

The subpoena, as to all movants, is restricted, in its scope, to the data therein called for in so far only as it relates to the fertilizer business of the movant, including, of course, materials, etc., used in the fertilizer industry. This paragraph will be referred to as a general limitation.

Paragraphs 1, 2 and 3 are to be complied with by all movants.

Paragraph 4 calls for too many records and imposes a burden not commensurate with the end sought; therefore it is modified and held inapplicable to those holding less than 500 shares and a duly authenticated certificate, sufficient to meet the rules of evidence, will be deemed sufficient.

Paragraphs 5, 6, 7 and 8 are to be complied with subject to the general limitation.

Paragraphs 9 to 16 inclusive are restricted to the enumerated companies therein named and subject to the general limitation.

Paragraphs 17 and 18 are to be complied with.

Paragraphs 19 to 28 are to be complied with subject to the general limitation.

Paragraphs 29 and 30 are to be complied with by each movant.

Paragraphs 31 and 32 are to be complied with subject to the general limitation.

The information requested in the subpoena is necessary and material to the investigation now being conducted by the grand jury, and the subpoena describes with sufficient definiteness the documents sought to enable the party to comply with it. Ordinarily the time covered by the subpoena would be too long and would impose a burden out of proportion to the reasonable necessities of the case, but in the instant case, on account of the prior record in the industry and the similarity of the charges, the records called for are not unreasonable.

The movants are required to comply with paragraphs 1 to 8 inclusive, 18, 24, 25, 27 to 32, inclusive, by April 22, 1940. Paragraphs 9 to 17 inclusive, 19 to 23 inclusive and 26 are to be complied with by years and on the dates named: for the years

named in the subpoena up to and including the year 1936, by April 22, 1940; for 1937 and 1938, by May 6, 1940; for 1939, by May 20, 1940.

■ If the movants will make available, in their home and branch offices, to two of the Attorney General's staff in charge of this investigation, the documentary evidence called for in the subpoena in order to eliminate the production of any record not deemed by them essential, the court will enter an order accordingly. This course appears desirable in the interest of all parties. If all of the records are produced in Winston, the attorneys for the United States will be required to assemble the data for the grand jury. In the very nature of the case and the voluminous records, much of it could be eliminated at the office and avoid crating, shipping and the disruption of the office files.

For the reasons set forth above, the actions to quash and vacate the subpoena are each and all overruled.

On Motion of Cudahy Packing Co., of Chicago, Ill., for Reargument.

■ This cause coming on to be heard before the Court on the motion for reargument on the order heretofore made in this cause, insofar as it relates to the movant, Cudahy Packing Company, and after hearing the reargument in the cause, and the Court being of the opinion, as indicated in its former opinion which shows that the factual situation with respect to the Cudahy Packing Company is different from that of the other companies, and the Court still being of the opinion that the volume of business conducted by the Cudahy Packing Company in the fertilizer industry is small in comparison both with the industry and with the other business in which this company is engaged, and it further appearing to the Court that this witness does not keep a separate fertilizer business from its other business, and that the task of segregating its records by reason of that fact is greater than it would be if it had a separate business of that kind, and it further appearing to the Court that it might impose an unnecessary hardship upon this company to segregate its records for the entire time called for in the subpoena and as modified by the Court; it is now ordered, that the former order of this Court, insofar as it affects the Cudahy Packing Company, is modified to the extent that it is required to produce the records therein called for for the years

1937, 1938 and 1939, and that insofar as the records of this company for years prior thereto are concerned, the Court reserves the right to pass upon the necessity of its producing such records until after the Grand Jury has completed its investigation for the three years herein stated. If it becomes necessary, in the event the Grand Jury should call for the other records, the Court will then entertain a motion, after notice to this company, to require it to produce the records for years prior to 1937.

NOTE.

(1) Articles of Incorporation and the Certificate of Incorporation or other Charter of the corporation herein named and all amendments thereto; if the firm herein named is a co-partnership, the Articles of Co-partnership and all amendments thereto.

(2) The by-laws of the corporation herein named and all amendments thereof.

(3) All books and records which show the names of the officers and directors of the corporation herein named and their residence addresses for each year from January 1, 1930 to date.

(4) All stockholders lists, registers and any other records or documents which show the names and addresses of all stockholders of the corporation herein named and the number of shares of stock held by each from January 1, 1930 to date, including any and all persons, partnerships and corporations which have a beneficial interest in any stock of said corporation with the names of the record holders of any such stock; if a partnership, the names and residence addresses of all the co-partners.

(5) All minute books and other papers, records and documents containing the minutes or record of proceedings, including all motions made and resolutions offered and the action taken thereon, at all meetings of (a) stockholders (b) directors (c) the executive committee (d) the sales committee, and (e) any other committees or boards of the corporation herein named from January 1, 1930 to date.

(6) Copies of the annual reports of the corporation herein named for each year from January 1, 1930 to date and all of the reports by any officer or Board of Directors or Board of Officers or committee of said corporation from January 1, 1930 to date.

(7) All price lists, both wholesale and retail, and all invoices, books, papers and records showing the prices quoted by the firm or corporation herein named and its subsidiaries and affiliated companies to all classes of purchasers of mixed fertilizers and fertilizer materials (including phosphate rock, superphosphates and concentrated superphosphates, sulphur, sulphuric acid, nitrogenous bearing materials, potash salts and potash bearing materials) and any and all changes in said prices from January 1, 1930 to date.

(8) All books, records, memoranda, papers, writings and other documents of the firm or corporation herein named and its subsidiaries and affiliated companies which show for each of the years from January 1, 1930 to date (a) the total capacity of each of said companies to manufacture, produce, distribute and sell mixed fertilizers or fertilizer bearing materials (including phosphate rock, superphosphates and concentrated superphosphates, sulphur, sulphuric acid, nitrogenous bearing materials, potash salts and potash bearing materials) either in bulk or in any type of container used by said firm or corporation (b) the total quantity of said products respectively manufactured, distributed and sold by said corporation and (c) the total sales of each type, grade, or classification of said fertilizers or fertilizer materials by said firm or corporation during said period.

(9) All contracts between the individual, firm, or corporation herein named and the trade associations or corporations hereinafter specified in this subdivision hereof; also all letters, telegrams, correspondence, memoranda, reports and other communications exchanged by or passing between the individual, firm, or corporation herein named (its officers, directors, agents and employees and its subsidiaries and affiliated companies, and their officers, directors, agents and employees) and the following named trade associations or corporations (their officers, directors, employees or agents) connected with the fertilizer industry:

National Fertilizer Association (and all of its district, branch, zone or subzone offices)

The Potash Institute (and all of its district, branch, zone or subzone offices)

The Phosphate Rock Institute

Potash Export Corporation

Phosphate Export Association

Sulphur Export Corporation

Florida Hard Rock Phosphate Export Association

Burlap Exchange of Baltimore

Textile Bag Manufacturers' Association

The Jute and Gunnies Importers Association

and/or passing between the individual, firm or corporation herein named and all other trade associations or import or export corporations or associations (their officers, directors, agents and employees) referring or relating in any way to the fertilizer industry or to trade practices within said industry or to the production, manufacture, import, export, distribution, disposition, purchase or sale of fertilizers, mixed fertilizers or fertilizer materials (including phosphate rock, superphosphates and concentrated superphosphates, sulphur, sulphuric acid, potash salts and potash bearing materials, and nitrogenous bearing materials) during all years from January 1, 1930 to date.

(10) All contracts between the individual, firm or corporation herein named and the firms or corporations hereinafter specified in this subdivision hereof; also all letters, telegrams, correspondence, memoranda, reports and other written communications exchanged by or passing between the corporation herein named (its officers, directors, agents or employees, and its subsidiaries and affiliated companies, and their officers, directors, agents and employees) and any of the following firms or corporations:

N. V. Potash Export My.

American Potash and Chemical Corporation

United States Potash Company

Potash Company of America
and/or exchanged by or passing between the individual, firm or corporation herein named and all other firms and corporations manufacturing, mining, producing, refining, distributing, importing, exporting, delivering or selling potash bearing materials or in any way referring or relating to the mining, refining, import, export, distribution, disposition, delivery, purchase or sale of potash salts or potash bearing materials during all years from January 1, 1930 to date.

(11) All contracts between the individual, firm or corporation herein named and the firms or corporations hereinafter specified

in this subdivision hereof; also all letters, telegrams, correspondence, memoranda, reports, and other communications exchanged by or passing between the corporation herein named (its officers, directors, agents and employees, and its subsidiaries and affiliated companies and their officers, directors, agents and employees) and any of the following named firms or corporations: [Ed. Note.—Here follow the names of the firms or corporations] and/or exchanged by or passing between the individual, firm or corporation herein named and all other firms and corporations engaged in manufacturing, producing, importing, exporting, distributing, purchasing or selling nitrogenous bearing materials for use as fertilizers or for use in the manufacture of mixed fertilizers, or fertilizer materials, during all years from January 1, 1930 to date.

(12) All contracts between the individual, firm or corporation herein named and the firms or corporations hereinafter specified in this subdivision hereof; also all letters, telegrams, correspondence, memoranda, writings and other communications exchanged by or passing between the individual, firm or corporation herein named (its officers, directors, agents and employees, and its subsidiaries and affiliated companies, and their officers, directors, agents and employees) and the following named corporations (their officers, directors, employees or agents)

Texas Gulf Sulphur Company

Freeport Texas Company

and/or exchanged by or passing between the individual, firm or corporation herein named and other individuals, firms or corporations engaged in mining, refining, importing, exporting, distributing, delivering, purchasing or selling sulphur, pyrites, or sulphur bearing materials, during all years from January 1, 1930 to date.

(13) All contracts between the individual, firm or corporation herein named and the firms or corporations hereinafter specified in this subdivision hereof; also all letters, telegrams, correspondence, memoranda, writings, and other communications exchanged by or passing between the individual, firm or corporation herein named (its officers, directors, agents and employees, and its subsidiaries and affiliated companies, and their officers, directors, agents and employees) and the following named individuals, firms and corporations: [Ed. Note.—Here follow the names of the

individuals, firms, or corporations] and/or exchanged by or passing between the individual, firm or corporation herein named and all other individuals, firms or corporations in any way referring or relating to the mining, refining, distribution, disposition, delivery or sale of phosphate rock, raw or processed, during all years from January 1, 1930 to date.

(14) All contracts between the individual, firm or corporation herein named and the individuals, firms or corporations hereinafter specified in this subdivision hereof; also all letters, telegrams, correspondence, memoranda, reports and other communications exchanged by or passing between the corporation herein named (its officers, directors, agents and employees, and its subsidiaries and affiliated companies, and their officers, directors, agents and employees) and the following named fertilizer or fertilizer material brokers and commission merchants (their officers, directors, employees or agents):

Ashcraft-Wilkinson Company

Woodward & Dickerson

R. S. Mueller Company

Hollingshurst & Company

H. J. Baker & Brother

Morgan Brothers

Bradley & Baker

William E. Wellman

Henry L. Taylor

Joseph Schmaltz

L. W. Huber Company

and/or exchanged by or passing between the individual, firm or corporation herein named and all other fertilizer or fertilizer material brokers or commission merchants referring or relating in any way to the production, manufacture, import, export, distribution, disposition, delivery, purchase or sale of mixed fertilizers or mixed fertilizer materials (including phosphate rock, superphosphates, sulphur, sulphuric acid, potash salts and potash bearing materials, and nitrogenous bearing materials), during all years from January 1, 1930 to date.

(15) All contracts between the individual, firm or corporation herein named and the firms or corporations hereinafter specified in this subdivision hereof; also all letters, telegrams, correspondence, memoranda, writings and other communications exchanged by or passing between the individual, firm or corporation herein named (its officers, directors, agents and em-

ployees, and its subsidiaries and affiliated companies, their officers, directors, agents and employees) and the following named fertilizer bag manufacturing companies (their officers, directors, employees and agents) :

Bemis Brothers Bag Company

Fulton Bag and Cotton Mills

The Raymond Bag Company

Acme Burlap Bag Company, Inc.

King-Perkins Bag Company

Burlap Exchange of Baltimore

Textile Bag Manufacturers Association

The Jute and Gunnies Importers Association

and/or exchanged by or passing between the individual, firm or corporation herein named and any other fertilizer bag or container manufacturing businesses or companies referring or relating in any way to the production, manufacture, import, export, distribution, delivery, purchase or sale of fertilizer bags or bagging or containers or referring or relating in any way to the manufacture, import, export, distribution, disposition, purchase or sale of mixed fertilizers or fertilizer materials, during all years from January 1, 1930 to date.

(16) All contracts between the individual, firm or corporation herein named and the individuals, firms or corporations hereinafter specified in this subdivision hereof; also all letters, telegrams, correspondence, memoranda, writings and other communications exchanged by or passing between the individual, firm or corporation herein named (its officers, directors, agents, and employees, and its subsidiaries and affiliated companies, and their officers, directors, agents and employees) and the following named individuals, firms or corporations (their officers, directors, agents and employees) engaged in the manufacture of fertilizers or mixed fertilizers: [Ed. Note. —Here follow the names of individuals, firms or corporations] and/or exchanged by or passing between the individual, firm or corporation herein named and any other individual, firm or corporation referring or relating in any way to the production, manufacture, import, export, distribution, disposition, delivery, purchase or sale of fertilizers or mixed fertilizers or fertilizer materials, during all years from January 1, 1930 to date.

(17) All contracts between the individual, firm or corporation herein named and European, South American, or foreign companies or cartels or syndicates or associations, in any way referring or relating to the import, export, distribution, or sale of fertilizers or fertilizer materials; also all letters, telegrams, correspondence, memoranda, writings and documents exchanged by or passing between the individual, firm or corporation herein named (its officers, directors, agents and employees, and its subsidiaries and affiliated companies and their officers, directors, agents and employees) and all European, South American and foreign companies or cartels or syndicates or associations (and their officers, directors, agents and employees) in any way relating or referring to the production, manufacture, import, export, distribution, disposition, delivery, purchase or sale of fertilizers or mixed fertilizers or fertilizer materials (including phosphate rock, superphosphates and concentrated superphosphates, sulphur, sulphuric acid, potash salts and potash bearing materials, and nitrogenous bearing materials) for all years from January 1, 1930 to date.

(18) All letters, telegrams, correspondence, memoranda, reports, books, papers, records, and documents in any way referring or relating to a conference at Rome, Italy, held in or about July, 1938, which had to do with discussions or deliberations or meetings relating to quotas or prices or trade practices in American or European or world distribution or sale of potash salts or potash bearing materials, or nitrogenous bearing materials, or superphosphates, or concentrated superphosphates or sulphur, or sulphuric acid, or phosphate rock, or fertilizers, or mixed fertilizers, or which had to do with the formulation of an agreement or agreements with respect to quotas or prices or practices in American or European or world distribution of any of said products or materials.

(19) All contracts between the individual, firm or corporation herein named and his or their dealers or agents, or principals for all years from January 1, 1930 to date; also all letters, telegrams, correspondence, memoranda, reports, papers and documents exchanged by or passing between the individual, firm or corporation herein named (its officers, directors, agents and employees and its subsidiaries and affiliated companies and their officers, directors, agents and employees) and their said dealers and agents or principals during said period in any way referring or relating to the manufacture, production, import,

export, distribution, disposition, delivery, purchase or sale of fertilizers, mixed fertilizers, or fertilizer materials (including phosphate rock, superphosphates, concentrated superphosphates, sulphur, sulphuric acid, potash salts and potash bearing materials, and nitrogenous bearing materials) during said period.

(20) All contracts of purchase and/or sale of fertilizers, mixed fertilizers and/or fertilizer materials, between the individual, firm or corporation herein named and others for all years from January 1, 1932 to date.

(21) All letters, telegrams, correspondence, memoranda, documents and writings, in any way referring or relating to the contracts referred to in the preceding number hereof, or the terms and conditions of sale, purchase, disposition, and delivery of fertilizers, mixed fertilizers and/or fertilizer materials during said period; also all ocean freight rate books or schedules, railroad rate books or schedules, and trucking rate books or schedules used as a basis for apportioning transportation or delivery charges included in quoted prices; also all contracts, invoices, statements, letters, telegrams, correspondence, books, records, and documents in any way referring or relating to the transportation or delivery charges actually incurred in delivering the products or materials involved in said shipments during all years from January 1, 1930 to date.

(22) All books, records, papers, documents and writings relating to and showing the exact method by which the individual, firm or corporation herein named computed or arrived at prices quoted to customers in various areas, districts, divisions, zones and subzones throughout the United States during the period from January 1, 1932 to date.

(23) All contracts, correspondence, books, records and documents in any way referring or relating to the use by the individual, firm or corporation herein named or others in the fertilizer industry of zones or ports of entry or basing points for the purpose of computing prices quoted to prospective purchasers during all years subsequent to January 1, 1930.

(24) All contracts, books, papers, records and documents which show a beneficial interest of any kind, and the extent thereof, during the past ten years, on the part of the individual, firm or corporation herein named in any firm or corporation

mining, refining, manufacturing, producing, importing, exporting, purchasing, selling or distributing fertilizers, mixed fertilizers or fertilizer materials (including phosphate rock, superphosphates, or concentrated superphosphates, sulphur, sulphuric acid, potash salts or potash bearing materials and nitrogenous bearing materials) or in any railroad, barge, steamship or trucking company or carrier which has transported or now transports any fertilizers, or mixed fertilizers or fertilizer materials, or in any firm or corporation which has manufactured or now manufactures fertilizer bags or fertilizer plant equipment or machinery.

(25) All books, papers, records and documents in any way referring or relating to any stocks of fertilizers, mixed fertilizers or fertilizer materials kept on hand or in storage by the individual, firm or corporation herein named from January 1, 1933 to date, specifying the place of storage, the stocks thereof, the dates when stored, the sources of such materials, the purchase price thereof, the charges incurred or paid for such storage, and the value at which such stocks were or are inventoried.

(26) All interoffice letters, telegrams, correspondence, reports, writings and memoranda exchanged by or passing between the firm or corporation herein named and its branches, subsidiaries and affiliates, for all years from January 1, 1930 to date in any way referring or relating to the manufacture, production, import, export, distribution, disposition, delivery, purchase or sale of fertilizers, mixed fertilizers, or fertilizer materials.

(27) All books, records, papers and documents in any way referring or relating to the acquisition or purchase by the individual, firm or corporation herein named of any mine, refinery, plant, factory, branch, subsidiary, affiliate or business having to do with the production of fertilizers, mixed fertilizers or fertilizer materials from any other person, firm or corporation during the past twenty years, including all records showing the amount paid therefor, the date of such purchase or acquisition, the name of the seller and all other terms and conditions of such transaction.

(28) All books, records, papers and documents in any way referring or relating to the sale by the individual, firm or corporation herein named of any mine, refinery, plant, factory, branch, subsidiary, affiliate or business having to do with the produc-

tion of fertilizers, mixed fertilizers or fertilizer materials to any other person, firm or corporation during the past twenty years, including all records showing the amount received therefor, the date of such sale, the name of the buyer and all other terms and conditions of such transaction.

(29) All books, papers, records and documents in any way referring or relating to interlocking directorships, during the past ten years, as between the corporation herein named and any other corporations engaged in the production, distribution, purchase or sale, import or export, of fertilizers, mixed fertilizers or fertilizer materials (including phosphate rock, sulphur, sulphuric acid, superphosphates and concentrated superphosphates, potash salts and potash bearing materials and nitrogenous bearing materials).

(30) All letters, telegrams, correspondence, papers, books, records, minutes, reports, documents and memoranda in any way referring or relating to meetings of any of the following described persons in the fertilizer industry: miners and refiners of fertilizer materials, dealers, wholesalers, retailers, jobbers, brokers, commission merchants and warehousemen, manufacturing or producing or distributing or purchasing or selling or importing or exporting or delivering fertilizers, mixed fertilizers or fertilizer materials (including phosphate rock, superphosphates and concentrated superphosphates, sulphur, sulphuric acid, potash salts and potash bearing materials, and nitrogenous bearing materials) during all years from January 1, 1930 to date.

(31) All books, papers, records, writings and documents of the individual, firm or corporation herein named relating to and showing the following for all years from January 1, 1932 to date:

(a) Gross sales for each year.

(b) Gross profit from operations for each year.

(c) Net profit from operations for each year.

(d) Cost of raw or other materials entering into finished products for each year.

(e) Selling costs for each year.

(f) Delivery expenses for each year.

(g) Cost of production of each grade or classification of products sold during each year.

(h) Gross cost of production of all products manufactured and sold during each year.

(32) Accountants reports to the individual, firm, or corporation herein named with respect to the financial operations of said individual, firm or corporation for each year during the period from January 1, 1932 to date.