**GLASS v. ICKES, Secretary of the Interior.**

**No. 7460.**

United States Court of Appeals for the
District of Columbia.

Decided Aug. 26, 1940.

C. L. Dawson and L. Karlton Mosteller, both of Washington, D. C., for appellant.

Nathan R. Margold, Solicitor, and Frederick L. Kirgis and Harry M. Edelstein of the Solicitor's Office, Interior Department, all of Washington, D. C., for appellee.

Before GRONER, Chief Justice, and EDGERTON and VINSON, Associate Justices.

VINSON, Associate Justice.

This is an appeal from a judgment of the District Court dismissing the appellant's complaint on the ground that it failed to state a cause of action.

The appellant's action is one for defamation, and is based on an allegedly libelous press release issued by the appellee, present Secretary of the Interior (referred to herein as the Secretary). The material allegations of the complaint are as follows: On November 23, 1938, the Secretary "wilfully and maliciously published, released, circulated and delivered to the Press Associations * * * and to divers other persons, and caused to be published to the world, a false and defamatory written memorandum press release * * *" which reads as follows:

"United States
"Department of the Interior
"Memorandum for the Press
"For Release November 23, 1938

"Oil operators being 'personally' invited on a 'Strictly confidential' basis to contribute some $5,000 to an oil lobbying fund sought by John D. Glass, Tyler, Texas, lawyer, were advised by Secretary of the Interior Harold L. Ickes today to investigate.

"Making information which had come to him public, Secretary Ickes said:

" 'Mr. Glass has been barred from practice before the Department. The Courts to date have refused Mr. Glass' prayer that this action be enjoined. I suggest that oil operators given an opportunity by Mr. Glass to kick in to his fund stop, look, and listen before they finance this proposed one-man lobby.' "

"The present letters are being circulated under Mr. Glass' professional letter head and over his signature reciting that he is engaged in an effort to secure 'immediate reforms in the Connally Hot Oil Act enforcement' to eliminate what he described as 'discriminations.' These letters which go to oil operators set forth that he desires legislation to benefit various persons engaged in the oil business including 'small independent units.' He also advocates legislation to end prosecuting violators under felony statutes and substitutes misdemeanor prosecutions. Mr. Glass states that he proposes to enlist senators and representatives in support of his proposals, and recites that he has gotten certain publications to support his stand and concludes:

" 'I have much personal interest in this matter and had intended to pursue it without any material financial assistance. But my present income is so limited that it now appears that to properly carry forward this campaign will require help to the extent of about $5,000. I am therefore writing this to you and to several other oil operators who I believe should be interested. I ask that you please give it your careful consideration, and if you believe my efforts are worth while, that you kindly communicate to me any suggestions you may have to offer as to how I might acquire the needed funds.

" 'The source of any assistance offered will be kept strictly confidential as will any communication from you in the matter.'

"The record shows that prior to September 15, 1937, Mr. Glass was chief investigator of the Federal Petroleum Agency No. 1 in the Department of the Interior, the investigative agency of Federal Tender Board No. 1. Effective September 15, 1937, he resigned his position in order to practice law at Tyler, Texas. A Departmental regulation promulgated by Secretary Ickes in March of 1933, provides that no ex-employee of the Department may practice before the Department or any of its agencies or boards for two years after his services with the Department are terminated. This regulation is to prevent Government employees selling confidential knowledge and experience. Contrary to such regulation Mr. Glass attempted to represent one Everett Brewer in a proceeding before the Federal Tender Board. Prior to his resignation Mr. Glass had supervised a matter in which Mr. Brewer was concerned and has initialed and signed memoranda to his superior, the Director of the Federal Petroleum Agency in which he had recommended that certain action be taken. After Mr. Glass resigned Mr. Brewer was subpoenaed

by the Federal Tender Board to appear before the Board and testify in this very matter.

"When these facts were called to the attention of the Secretary of the Interior, he pointed out to the Federal Tender Board the existence of the Departmental regulation and instructed the Federal Tender Board that it be governed thereby in the event any former employee should appear before the Board. Mr. Glass was thereafter prevented from practicing before the Board.

"He commenced an action in the United States District Court in Texas against the Federal Tender Board attempting to enjoin the Board from preventing him from practicing before it. That action was dismissed for failure to serve Secretary Ickes as a defendant. Thereupon Glass brought an action in the United States District Court for the District of Columbia against Secretary Ickes and the Director of the Petroleum Conservation Division to enjoin them from enforcing the Departmental regulation and preventing him from practicing before the Federal Tender Board.

"Among the grounds urged by Glass for the issuance of an injunction were the lack of authority of the Secretary to promulgate the regulation, its unreasonableness, its unconstitutionality, and that it was being unfairly applied to him. He moved the Court for a preliminary injunction but the motion was denied by Judge Bailey who held that the Secretary was authorized to promulgate the regulation, and that it was reasonable."

In specifying the libelous portion of this press release the complaint charged that it conveyed and was intended "to convey to all oil operators and the public false statements to the effect that plaintiff immorally, unethically, and unlawfully sold or attempted to sell or otherwise misuse confidential information and knowledge, obtained while previously employed by the Government, in a certain case or proceeding before said Board, and that plaintiff was unworthy of the confidence and respect of all oil operators and the public." Further it alleged that this was false and known to be so by the Secretary but that he "deliberately, wilfully, and maliciously published, released and circulated said press release for the purpose of injuring, damaging and discrediting plaintiff and his reputation, and for the purpose of injuring and destroying his professional standing and reputation as an attorney and member of the bar of the State of Texas". Damages, compensatory and punitive, were prayed for in the sum of $750,000.

The Secretary moved in the District Court to dismiss the complaint on the ground that it "failed to state a claim upon which relief can be granted". The motion was sustained and the complaint dismissed.

In attacking the decision of the District Court the appellant urges first, that the communication in question is libelous, and second, that it is not absolutely privileged. It may be observed in respect to the first point that the appellant concedes that, for the most part, the statements contained in the press release are literally true.[1] If any libel is to be found therein it must be by innuendo. As to whether there is such the parties have addressed

---

[1] In connection with the statement in the communication to the effect that the appellant had been barred from practice before the agencies administering the Act the appellant in his brief argues as follows:

"Doubtless under literal meaning of the word 'barred,' it is true that by virtue of the regulation and its application by Ickes all present and former employees of the Department of the Interior and the Connally Act Agencies were 'barred' from practice before the Department for the temporary period of two years after leaving such service; and, as Mr. Glass was one of that class, it is the literal truth that 'he had been barred from practice.' Yet, no one can deny that the broadcasting to the world of this unqualified statement conveys to the public much more than the above truth.

"Such statement just naturally conveys an untruth, even though perhaps in a strict literal sense it is true. Owing to the universal manner in which the statement in question is accepted by the ordinary person, particularly when used in connection with a lawyer, it results in an impeachment of his character.

"To convey the truth in the matter to the average person takes more than that statement. To convey the truth when undertaking to tell the status of one of the many employees and ex-employees of the Department, one must say much more than the above bare and unqualified literally true statement. He must say something on this order: 'There is (or was) a

considerable argument. We find it unnecessary to decide that question, however, in light of our view on the second issue presented. This more fundamental issue is the question whether the communication involved is privileged to the extent that it cannot be the subject of an action for libel.

■■■ An act may be privileged from civil liability conditionally or absolutely. If a privilege merely conditional in nature is accorded, allegations in the plaintiff's complaint to the effect that improper motive prompted the defendant to act, will succeed in bringing the latter into court to have a jury pass on that charge. Considerations of public policy argue against this eventuality in respect to certain types of acts, so an absolute privilege is accorded in respect to these, in which case allegations of "malice" or improper motive in a complaint are of no significance. It has long been settled, for example, that a judge is absolutely privileged from civil liability in respect to acts done in the course of his judicial duties.[2] In 1895 the Supreme Court was confronted in Spalding v. Vilas, 161 U.S. 483, 16 S. Ct. 631, 635, 40 L.Ed. 780, with the question whether a similar privilege should be accorded a cabinet officer in respect to an allegedly libelous communication issued in the course of his official duties. In deciding the issue Harlan, J., writing for a unanimous court remarked in part as follows:

"If as we hold to be the case, the circular issued by the Postmaster General to claimants under the acts of Congress in question was not unauthorized by law, nor beyond the scope of his official duties, can this action be maintained because of the allegation that what that officer did was done maliciously?
* * *

"We are of the opinion that the same general considerations of public policy and convenience which demand for judges of courts of superior jurisdiction immunity from civil suits for damages arising from acts done by them in the course of the performance of their judicial functions, apply to a large extent to official communications made by heads of executive departments when engaged in the discharge of duties imposed upon them by law. The interests of the people require that due protection be accorded to them in respect of their official acts. As in the case of a judicial officer, we recognize a distinction between action taken by the head of a Department in reference to matters which are manifestly or palpably beyond his authority and *action having more or less connection with the general matters committed by law to his control or supervision.* * * * In exercising the functions of his office, the head of an Executive Department, keeping within the limits of his authority, should not be under an apprehension that the motives that control his official conduct may, at any time, become the subject of inquiry in a civil suit for damages. It would seriously cripple the proper and effective administration of public affairs as intrusted to the executive branch of the government, if he were subjected to any such restraint." (Italics supplied)

It is interesting to note that at about the same time the English Court of Queen's Bench independently enunciated the same principle and in support thereof adduced substantially the same reason.[3]

---

Departmental regulation which prohibits all of its employees from appearing as agents or attorneys before it for a period of two years after they leave the Department, and, inasmuch as Mr. Glass has been out of the service less than two years, he can not yet practice before it.'

"The truth could be conveyed in various ways—and admittedly in a shorter sentence than that; but never by merely: 'Mr. Glass has been barred from practice before the Department'."

It is the contention of the Secretary that the entire communication, at somewhat greater length, in substance merely reports what the appellant thus admits is a truthful account of the facts. The appellant contends, however, that the communication elaborates at length on the facts in order to distort them so as to give rise to defamatory innuendo. This the Secretary earnestly denies.

[2] Bradley v. Fisher, 13 Wall. 335, 80 U.S. 335, 350, 351, 20 L.Ed. 646.

[3] Chatterton v. Secretary of State for India, [1895] 2 Q.B. 189, 191, 192: Lord Esher, M. R. "The reason for the law on this subject plainly appears from what Lord Ellenborough and many other judges have said. It is that it would be injurious to the public interest that such an inquiry should be allowed, because it would tend to take from an officer of state his freedom of action in a matter concerning the public weal. If an officer of state were liable to an action of li-

The principle laid down in the Vilas decision, to the effect that a Departmental head is absolutely privileged from liability for defamatory statements made "more or less [in] connection with the general matters committed by law to his control or supervision", has been applied by this court on several occasions.[4] Despite the appellant's apparent dissatisfaction with the rule[5] it appears to be well settled. Indeed, it has so commended itself to contemporary legal scholars that the American Law Institute has been moved to adopt it in codified form as a section of the Restatement of Torts.[6]

■■■ Some contention is made by the appellant that this privilege applies only to communications between governmental officials, and not to those from an official to the general public. No such limitation is justified by the language of the Supreme Court in the Vilas case[7] nor has this court recognized such a distinction. On the contrary, we have previously held a communication, released generally to the press, within this executive privilege.[8] It may be that there are circumstances under which an official would exceed his prerogative in issuing a particular communication to the press. There are clearly other circumstances, however, when a department head may properly issue public statements in his official capacity.[9] The question to be answered when an action for libel is brought on the basis of

---

bel in respect of such a communication as this, actual malice could be alleged to rebut a plea of privilege, and it would be necessary that he should be called as a witness to deny that he acted maliciously. That he should be placed in such a position, and that his conduct should be so questioned before a jury, would clearly be against the public interest, and prejudicial to the independence necessary for the performance of his functions as an official of state. Therefore the law confers upon him an absolute privilege in such a case."

It is significant to note that in this decision the communication in question had been published in the press and the plaintiff's complaint charged the defendant with having caused that publication.

[4] DeArnaud v. Ainsworth, 1904, 24 App.D.C. 167, 5 L.R.A.,N.S., 163; Farr v. Valentine, 1912, 38 App.D.C. 413; Mellon v. Brewer, 1927, 57 App.D.C. 126, 18 F.2d 168, 53 A.L.R. 1519, certiorari denied 275 U.S. 530, 48 S.Ct. 28, 72 L.Ed. 409. See also Smith v. O'Brien, 1937, 66 App.D.C. 387, 88 F.2d 769; United States v. Brunswick, 1934, 63 App.D.C. 65, 69 F.2d 383; Cooper v. O'Connor, 1938, 69 App.D.C. 100, 99 F. 2d 135, 118 A.L.R. 1440 (action for malicious prosecution).

[5] It is apparent from the conclusion of the appellant's brief that his real grievance is against the rule laid down by the Supreme Court in the Vilas case and followed by this court on numerous occasions. That is made clear by the following extract therefrom: "When we examine into the contentions of appellee's counsel, to the effect all manner of statements by a public official, made in 'relation to' matters under his supervision, are absolutely privileged, the evils of such a doctrine become obvious." This statement by the appellant of the rule

so objectionable to him is in our opinion a reasonably accurate paraphrase of the holding in the Vilas case. Cf. American Law Institute statement of the rule set forth in note 6, infra.

The appellant starts a parade of the "horribles" from the premise that this rule permits a cabinet officer to freely libel anyone who criticized his administration. We have not construed the rule that broadly in our disposition of the instant case and it seems at least doubtful whether it is as broad as the appellant charges.

[6] Restatement of Torts (1938) § 591:

"Executive Proceedings.

"The President of the United States and the Governor of any State or Territory thereof, cabinet officers of the United States and the corresponding officers of any State or Territory thereof are absolutely privileged to publish false and defamatory matter of another in the exercise of an executive function, if the matter has some relation to the executive proceeding in which the officer is acting."

[7] On its facts the Vilas case involved a communication by the Postmaster General to some 4,000 persons respecting their claims for back compensation under an Act of Congress. Some of these persons were still employees of the Postal Department while others were not. Hence, the communication could not be treated as one between officials, but rather as one from an official to claimants under an Act of Congress administered by him. The Supreme Court so treated it. See note 8, infra.

[8] Mellon v. Brewer, 57 App.D.C. 126, 18 F.2d 168, 53 A.L.R. 1519, certiorari denied 275 U.S. 530, 48 S.Ct. 28, 72 L. Ed. 409.

[9] "The act of the head of one of the departments of the government in calling the attention of any person having busi-

such a communication is simply whether the executive officer was within his official prerogative or duty in issuing it. More broadly—was the public communication "official" in character? In connection with this it is important to recall, as this court has pointed out in a previous opinion, that "It is not necessary—in order that acts may be done within the scope of official authority—that they should be prescribed by statute * * *; or even that they should be specifically directed or requested by a superior officer. * * * It is sufficient if they are done by an officer *in relation* to matters committed by law to his control or supervision' * * *; or that they have *more or less connection with* the general matters committed by law to his control or supervision. * * *' "10

The question thus arises whether in the instant case the allegedly libelous portions of the Secretary's communication had "more or less connection with the general matters committed by law to his control or supervision". It will be noted by reference thereto that the communication consisted of two parts. The first recites that the appellant has been circularizing oil operators seeking funds with which to finance his efforts to secure "immediate reforms in the Connally Hot Oil Act enforcement" and certain changes in the Act itself, together with an admonition that operators might well investigate the appellant before making contributions.

---

ness with such department to a statute relating in any way to such business cannot be made the foundation of a cause of action against such officers", Spalding v. Vilas, 161 U.S. 483, 493, 16 S.Ct. 631, 635, 40 L.Ed. 780; Mellon v. Brewer, 57 App.D.C. 126, 18 F.2d 168, 53 A.L.R. 1519, certiorari denied 275 U.S. 530, 48 S. Ct. 28, 72 L.Ed. 409 (press release answering charges of maladministration and denouncing the charging party). See also Chatterton v. Secretary of State for India, supra, n. 3, (communication published in press—absolute privilege applied to protect official from liability).

In United States v. Birdsall, 1914, 233 U.S. 223, 231, 34 S.Ct. 512, 513, 58 L. Ed. 930, it is pointed out that the scope of official duty may be defined by custom and usage. The practice of cabinet officers to issue public statements in respect to the activity of their departments is too well known to require comment. Indeed, such announcements serve a useful if not essential role in the functioning of the democratic processes of government.

The holding of the Birdsall case is also of significance in connection with the right of an administrator to issue public statements. There, the question was presented whether certain officers "duly appointed by the Commissioner of Indian Affairs, under the authority of the Secretary of the Interior, for the suppression of the liquor traffic among the Indians," acted in the scope of their official duties in making recommendations as to whether leniency should be granted persons who had been convicted and sentenced for engaging in the illegal traffic. Justice Hughes, writing for a unanimous Court, determined that the Department was given broad administrative authority over Indian affairs and that this included assistance by the Indian Office in enforcement of the statutes prohibiting the liquor traffic. From this it was concluded that: "there can be no question that the authority of the Department in its undertaking to suppress the forbidden traffic extended to every matter in which its aid was appropriate. That was the clear import of the legislation broadly defining its powers and of the action of Congress in supporting its work. Whenever it could afford assistance in the course of proceedings to secure the punishment of offenders it was fully empowered to give it. If a judge in fixing the sentence to be imposed upon those found guilty, or in determining whether the sentence as imposed should be suspended or reduced, desired to be advised of the recommendation of the Commissioner of Indian Affairs, in view of his knowledge of the conditions attending the enforcement of the law, the Commissioner was not lacking in authority to comply with the request. It is not enough to say that there is no mandatory requirement imposing the obligation to give the recommendation. In executing the powers of the Indian Office there is necessarily a wide range for administrative discretion, and in determining the scope of official action regard must be had to the authority conferred; and this, as we have seen, embraces every action which may properly constitute an aid in the enforcement of the law."

Public announcements might well, on occasion, be "an action which may properly constitute an aid in the enforcement of the law [Connally Hot Oil Act]".

10 Cooper v. O'Connor, 69 App.D.C. 100, 104, 99 F.2d 135, 139, 118 A.L.R. 1440.

This part of the communication is merely introductory, however, and the appellant does not, in his complaint, charge that it is in any way defamatory. The portion of the communication which the appellant does charge is libelous by innuendo is that which states he has been and is barred from practice before the agencies administering, under the Secretary, the Connally Hot Oil Act (referred to herein as the Act) and a recital of the surrounding circumstances. As the communication pointed out, the Secretary some years back promulgated a regulation forbidding former employees of the Interior Department from practicing before it or any of its agencies for two years after termination of their connection with the Department.[11] Certain general executive responsibility in respect to the Act is lodged in the Secretary[12] and he made this regulation applicable to the Act's administrative agencies.[13] Whether the regulation was promulgated and made applicable to these agencies under the Act of Congress authorizing him to prescribe qualifications for those representing claimants before his department or under the Secretary's general administrative authority is not here important.[14] The appellant does not in this proceeding question its validity.

From the foregoing it follows that the principal question presented for our determination is whether, when pursuant to this regulation a former employee is barred from practicing before agencies charged with administration and enforcement of the Act, it is proper for the Secretary, acting in his official capacity, to make a general announcement to that effect, explaining the regulation, its purpose, the conduct of the employee in reference thereto and its application to him.

Instructive on this point, as well, is the Vilas decision. There, the only pertinent duty imposed on the Postmaster General by statute was the transmission of compensation checks to the clients of the plaintiff. He did more, however, and inclosed a circular referring to an Act of Congress which required such direct transmittal, with an explanation that no attorney's services were necessary and further statement that under R.S. § 3477, 31 U.S.C.A. § 203, any transfer of the claim or power of attorney for receiving payment thereof was null and void. The plaintiff's complaint charged that this circular was published with malicious intent to some 4,000 claimants "to cause them to believe * * * that plaintiff had rendered them no service and that he was attempting falsely to claim for valuable services rendered under said contracts, falsely claimed to be valid, and using his [Postmaster General's] official character for such purpose, thus placing the plaintiff before the country as a common swindler; and to bring him into public scandal, infamy, and disgrace, and to injure his business * * *". In holding that the Postmaster General acted within the scope of his authority in issuing the circular the Supreme Court stated:

"It results that the postmaster general not only had the right, but it was his duty, to cause all checks or warrants, issued under the authority of the above acts of congress to be sent directly to the claimants. *If not strictly his duty, it was his right, to call the attention of claimants to the provisions of the act of 1883. * * ** *

---

[11] See Glass v. Ickes, 71 App.D.C. 60, 107 F.2d 259, for a statement respecting the promulgation of this regulation, its application to the Act's agencies, and discussion concerning the authority under which this action was taken.

[12] The Connally Hot Oil Act, 49 Stat. 30 et seq., 15 U.S.C.A. § 715 et seq., provides for federal administrative machinery to prevent the sale in interstate commerce of oil produced, transported, or withdrawn from storage in excess of amounts permitted by state laws. Administrative authority under the Act is lodged in the President but § 11, 49 Stat. 33, 15 U.S.C.A. § 715(j), permits him to designate an agent to act in his stead. On February 28, 1935, he issued an Executive Order, No. 6979,

15 U.S.C.A. § 715(j) note, which read in part as follows:

"I hereby designate and appoint the Secretary of the Interior as the agent of the President to execute all of the powers and functions vested in the President by the said act [Connally Hot Oil Act] * * * and I hereby expressly authorize the Secretary of the Interior to establish a Petroleum Conservation Division in the Department of the Interior, the functions and duties of which shall be: (1) to assist, in such manner as may be prescribed by the Secretary of the Interior, in administering the said act, * * *". 2 Fed.Reg. 2664.

[13] See note 11 supra.

[14] Ibid.

"Nor did the Postmaster General exceed his authority when he informed claimants that Congress required checks. or warrants to be sent to them 'because no attorney's services are necessary to the presentation of the claim before the Department.' * * * the statement * * * if not strictly accurate, was, at most, only an expression of the opinion of the Postmaster General in the course of his official duties. As he was charged with the execution of the will of Congress in relation to the readjustment of those salaries, he was entitled to express his opinion as to the object for which the act of 1883 was passed, and to indicate what, in his judgment, was necessary to be done in order to bring claims under that act properly before the Department. * * *

"The act of the head of one of the departments of the government in calling the attention of any person having business with such department to a statute relating in any way to such business, cannot be made the foundation of a cause of action against such officers". (Italics supplied) Spalding v. Vilas, 161 U.S. 483, 491, 493, 16 S.Ct. 631, 634, 40 L.Ed. 780.

 Taken together, it seems clear from this language the Supreme Court established the proposition in the Vilas case that a cabinet officer is within his official right or prerogative, hence absolutely privileged, in informing persons having business with his department of official action affecting such business, together with relevant explanation thereof.[15] That rule covers the instant case. Certain executive responsibility in respect to the Act is lodged in the Secretary. Under a regulation issued by him he prevented the appellant from appearing in a representative capacity before the Act's administrative agencies for a period of two years after severance of his connection therewith. The appellant does not question the official character of this action. Hence, it was proper, while the appellant's incapacity continued, for the Secretary to advise all those with rights subject to the Act (persons having business with him in his official capacity) that their rights could not be represented by the appellant before the agencies administering and en-

forcing it, during the proscribed period, together with a relevant explanation of the situation. Certainly, in light of the regulation, the right of the Secretary to so inform persons with rights subject to the Act seems at least as clear as the right of the Postmaster General in the Vilas case to inform claimants under an act administered by him that no attorney's services were required in the presentation of their claims thereunder and "what, in his judgment, was necessary to be done in order to·bring claims under that act properly before the department". It seems obvious that, to communicate information respecting the appellant's incapacity to the indefinitely large group of persons with rights subject to the Act,. publication of an announcement in the press was proper, if not essential.

We think it clear from the foregoing that, under the Vilas decision, the Secretary, acting within the scope of his official authority, could call public attention to the regulation prohibiting a former employee from appearing in a representative capacity before agencies charged with administration and enforcement of the Act, the purpose of the regulation, conduct of the appellant in reference thereto, and to action taken thereunder respecting him, at least so long as the period of prohibition continued. The portion of the Secretary's press release, subject of the appellant's complaint in the instant case, did just that.

 That the Secretary did not issue the release until the period of bar was more than half expired does not affect the privileged character of the communication for he issued it at a time when his authority to do so clearly continued. "He may have legal authority to act, but he may have such large discretion in the premises that it will not always be his absolute duty to exercise the authority with which he is invested. But if he acts, having authority, his conduct cannot be made the foundation of a suit against him personally for damages, even if the circumstances show that he is not disagreeably impressed by the fact that his action injuriously affects the claims of particular individuals"[16]. It was clearly for the.

---

[15] Cf. United States v. Birdsall, 233 U.S. 223, 231, 34 S.Ct. 512, 58 L.Ed. 930, discussed supra note 9, in light of the thought that such a communication might be regarded as an appropriate action to aid in the enforcement of the Act (in respect to which the Secretary has certain broad administrative powers) and more especially the regulation.

[16] Spalding v. Vilas, 161 U.S. 483, 498,

Secretary to decide, at least so long as the bar continued, whether an announcement should be made of the appellant's incapacity and, if so, when.

It may be observed in passing that it appears from the uncontradicted parts of the press release in question, that the Secretary issued it at a not inappropriate time. The appellant first attempted, unsuccessfully, to appear in a representative capacity before the Federal Tender Board, an agency charged with enforcement and administration of certain phases of the Act. Later, he circularized a large number of oil operators soliciting funds to assist, among other things, his efforts to secure "immediate reforms in the Connally Hot Oil Act *enforcement*". (Italics supplied). It would not appear entirely unreasonable under these circumstances for the Secretary to conclude that it might be desirable to warn prospective client-donors that the appellant could not ·then appear in representative capacity *before the administrative agencies charged by law with the enforcement of the Act.*

■ As stated, we are of the opinion that the portion of the press release relied on by the appellant as defamatory must be regarded as an official communication. " * * * the [Secretary], in issuing the [press release] * * * in question, did not exceed his authority, nor pass the line of his duty, as [Secretary of the Interior] * * *. The motive that impelled him to do that of which the plaintiff complains is therefore wholly immaterial. If we were to hold that the demurrer admitted, for the purposes of the trial, that the defendant acted maliciously, that could not change the law."[17]

The judgment of the District Court must be affirmed.

Affirmed.

GRONER, C. J.

The importance of the principle involved induces me to express my views separately.

The · opinion, I think, correctly states the rule of privilege applicable to an of-ficial of government and likewise its basis in a public policy that such officers should be at liberty to exercise their functions with independence and without fear of the consequences. The necessity of the rule is obvious, but its cloak of absolute immunity offers such far reaching opportunity for oppression, that it manifestly ought not to be extended beyond the impulse that gave it being.

So far as the complaint shows, the occasion which evoked the Secretary's press release was the knowledge of appellant's solicitation of funds to aid him in securing reforms in the administration of and changes in the structure of the Connally Act. But there is no law or regulation forbidding this or authorizing the Secretary officially to hinder or prevent it. Hence, I have felt some doubt about the correctness of the majority opinion, for there is nothing in the record to show that appellant was, at the time of the press release, seeking to appear before any Departmental agency or that there was then any occasion for enforcing against him the Departmental regulation. The incident referred to by the Secretary in the release happened more than a year before and, while appellant had challenged in the courts the validity of the regulation and the case was then pending on appeal, nothing in the complaint suggests that he was seeking to obtain clients whose interests he might subsequently represent in some matter pending in the Department. If, therefore, as I have assumed, he had the right to advocate changes in the law, and if it was alone the knowledge that he intended to assert this right which provoked the action of the Secretary, it is difficult to explain satisfactorily in what respect the Secretary's action was the performance of an official function.

On the other hand, it is quite true that both in this court and the Supreme Court the scope of official authority has been so broadly stated* that I am unable to say that the Secretary's press release was not, in view of the general authority of the Secretary concerning the oil industry,

---

499, 16 S.Ct. 631, 637, 40 L.Ed. 780. To the same effect see Standard Nut Margarine Co. v. Mellon, 63 App.D.C. 339, 72 F.2d 557, certiorari denied 293 U.S. 605, 55 S.Ct. 124, 79 L.Ed. 696.

[17] Spalding v. Vilas, 161 U.S. 483, 499, 16 S.Ct. 631, 637, 40 L.Ed. 780.

* See, for instance, Cooper v. O'Connor, 69 App.D.C. 100, 104, 99 F.2d 135, 139, 118 A.L.R. 1440, and cases cited there.

a matter "in relation to matters committed by law to his control" or at least "having more or less connection with the general matters committed. by law to his control". And, in this view I am impelled to concur in the opinion, though in doing so I express with great deference the fear that in this and previous cases we may have extended the rule beyond the reasons out of which it grew and thus unwittingly created a privilege so extensive as to be almost unlimited and altogether subversive of the fundamental principle that no man in this country is so high that he is above the law.

"The ocean has its appointed bounds, and were it to break through those limits its plenitude would become a cataclysm which would engulf a continent."