[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE MOTION TO DISMISS (No. 101)
The motion to dismiss now before the Court raises the question of whether the Attorney General's communications with the cress about a pending case were in excess of his statutory authority for purposes of the sovereign immunity doctrine. For the reasons set forth below, the communications in question were within the Attorney General's authority.
Some of the facts underlying the present case have been found by Satter, J. in a recent administrative appeal. Hultman v. State, No. 422879 (N.H.J.D. June 21, 2000). These facts are corroborated by independent evidence submitted by the defendant in this case. Additional facts, not before Satter, J. have also been submitted to this Court. From 1993 to 1995, Countryside Manor, Inc. was a long-term care facility in Bristol. Dorothy Huitman was its president, and Barry Hultman was its CT Page 12792 administrator. The Hultmans submitted cost reports to the Department of Social Services (DSS) to enable DSS to determine their rate of Medicaid reimbursement. Countryside's accountant subsequently informed DSS of several concerns regarding the cost reports.
On April 4, 1997, DSS issued a notice of regulatory violations and proposed sanctions to the Hultmans. On April 7, 1997, Attorney General Richard Blumenthal, through the Attorney General's office, issued a "News Release" that is the cynosure of this case. The News Release states in relevant part as follows:
 Attorney General Richard Blumenthal and Department of Social Services Deputy Commissioner Michael P. Starkowski today charged a mother and son who operated a Bristol nursing home with cheating the state out of more than $1 million in Medicaid reimbursements. They allegedly used the money to help build their state-of-the-art, luxury home in Avon and for other personal expenses.
 Dorothy Hultman and Barry Hultman of Avon are accused of billing the state for approximately $1.15 million in Medicaid reimbursements that they allegedly used for personal benefit — including $551,853 in salaries for people who built their home and payments to relatives and others who spent little or no time working at the Countryside Manor nursing home in Bristol.
 "Our audit showed that the Hultmans pocketed money meant for medical care — looting programs designed to help our most vulnerable citizens," Blumenthal said. "Their luxury home in Avon was literally built on the backs of taxpayers and their self-dealing deprived people in real need of aid. This case is one of the most reprehensible and outrageous Medicaid frauds we have seen. We want the money back and we want to shut these people out of the Medicaid program."
The News Release was subsequently posted on the Attorney General's internet web site.
On or about December 15, 1998, Blumenthal stated to a reporter for the Hartford Courant that the Hultmans were guilty of the most "egregious" and "blatant" abuse of Medicaid funds he had ever seen. CT Page 12793
Following a hearing before a hearing officer, DSS ordered the Hultmans to reimburse it for overpayments set forth in the notice of violations and suspended them from the Medicaid program. The Hultmans filed a timely appeal to the Superior Court. On June 21, 2000, Satter, J. dismissed the appeal. Huitman v. State, supra. Satter, J. specifically found that the various statements of the Attorney General quoted above were insufficient to establish bias on the part of the hearing officer. Id. at 12.
On May 8, 2000, the Hultmans commenced the present case by service of process. Barry and Dorothy Hultman are the plaintiffs; Richard Blumenthal is the sole defendant. The complaint does not state whether Blumenthal is being sued in his official or personal capacity. The summons, however, expressly describes Blumenthal as "Attorney General" and gives his address as "55 Elm St., Hartford, CT 06106." The plaintiffs' principal brief refers to the defendant as "the chief lawyer of the State of Connecticut." The plaintiffs' supplemental brief repeatedly refers to the defendant as "Attorney General Richard Blumenthal," "Attorney General Blumenthal," and "The Attorney General."
The plaintiffs' complaint is in four counts. The first count alleges that Blumenthal's publication of the News Release on the Attorney General's internet web site was defamatory as to Barry Hultman. The second count makes the same claim with respect to Dorothy Hultman. The third count alleges that Blumenthal's statement to the Hartford Courant reporter was defamatory as to Barry Hultman. The fourth count makes the same claim with respect to Dorothy Hultman.
On June 16, 2000, Blumenthal filed the motion to dismiss now before the Court. The motion contends that the Court lacks jurisdiction over the plaintiffs' claims. The motion was heard on October 16, 2000.
Our Supreme Court has recently explained the relationship between the common law doctrine of sovereign immunity and the statutory immunity provided by Conn. Gen. Stat. § 4-165 in actions brought against state officials, Put briefly, sovereign immunity is a shield that such officials can raise against claims brought against them in their official capacities, while statutory immunity provides a shield to be used against claims brought against such officials in their individual capacities.Shay v. Rossi, 253 Conn. 134, 162, 749 A.2d 1147 (2000). Because of this distinction, the first inquiry that must be made by the Court is whether the present case has been brought against Blumenthal in his official or individual capacity.
This inquiry here is more difficult than it should be because the complaint fails to state the capacity in which Blumenthal is being sued. CT Page 12794 Under Connecticut law, however, the identities of the parties are determined by their description in the summons. Conn. Gen. Stat. §52-45a; Practice Book § 8-1(a). The summons in this case unambiguously describes Blumenthal as "Attorney General." Moreover, as discussed above, the plaintiffs repeatedly refer to Blumenthal as "Attorney General Richard Blumenthal" (or some variation of that phrase) in their briefs. Beyond this, the allegations of the complaint and the evidence submitted to the Court all involve actions that Blumenthal took in his capacity as Attorney General. Indeed the principal allegation against him is that he published certain statements on the Attorney General's internet web site.
"[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. . . . As such, it is no different from a suit against the State itself." Will v. Michigan Dept. of State Police, 491 U.S. 58,71 (1989). It is well established that, "Whether a particular action is one against the state is not determined solely by referring to the parties of record. . . . The vital test is to be found in the essential nature and effect of the proceeding." Somers v. Hill, 143 Conn. 476,479, 123 A.2d 468 (1956). In Spring v. Constantino, 168 Conn. 563,362 A.2d 871 (1975), the Supreme Court articulated four criteria for determining whether a suit is, in effect, one against the State: "(1) a state official has been sued; (2) the suit concerns some matter in which that official represents the state; (3) the state is the real party against whom relief is sought; and (4) the judgment, though nominally against the official, will operate to control the activities of the state or subject it to liability." Id. at 568.
There can be no question that the first two Spring criteria are satisfied here. Blumenthal is a state official, and the suit plainly concerns a matter in which Blumenthal represents the State. The applicability of the fourth criterion is reasonably clear as well. The judgment sought, though nominally against Blumenthal, would operate to control the activities of the State. The substantive legal questions presented concern the material that the Attorney General can post on his official web site and the content of the statements he can give to journalists about a pending case. The resolution of these questions will necessarily control the activities of the State. The only question that is even arguably close is the third criterion: is the State the real party against which relief is sought? Nominally, of course, relief is sought against Blumenthal, but that is not dispositive of the issue. Blumenthal is represented by an Assistant Attorney General, and there can be little question that any judgment against him would ultimately be paid by the State. The plaintiffs contend that Blumenthal acted ultra vires in doing what he did, but for reasons that will be explored shortly, that CT Page 12795 argument cannot be successfully maintained. "[M]odern cases make clear that a state officer may be said to act ultra vires only when he acts without any authority whatever." Pennhurst State School Hospital v.Halderman, 465 U.S. 89, 101 n. 11 (1984). (Internal quotation marks and citation omitted.) Under these circumstances, the suit here must be construed as one against Blumenthal in his official capacity. As mentioned, this analysis is consistent with the nomenclature used by the plaintiffs themselves in their summons and briefs.
Because Blumenthal has been sued in his official capacity, the case is controlled by the doctrine of sovereign immunity. "[T]he doctrine of sovereign immunity implicates subject matter jurisdiction and is therefore a basis for granting a motion to dismiss." Amore v. Frankel,228 Conn. 358, 364, 636 A.2d 786 (1994). The question in sovereign immunity cases is whether the state official in question has acted "in excess of statutory authority." Shay v. Rossi, supra, 253 Conn. at 170. The phrase "in excess of statutory authority" is a term of art. Shay
explains that the phrase draws a line "somewhere between . . . two poles." Id. at 172. The first pole is "the doctrine of judicial immunity, which has been held not to apply only where the judicial conduct is so far outside the normal scope of judicial functions that the judge was in effect not acting as a judge." Id. at 170. The second pole is marked by a line of cases from other jurisdictions suggesting "that all it takes to trigger the doctrine is to establish, by a process of statutory interpretation, that the defendants' conduct was unauthorized." Id. at 171. Shay concludes that the true line of the doctrine is "somewhere between" these poles and frames its analysis as inquiring whether "the facts of this case bring it sufficiently outside the normal scope of the defendants' statutory authority to invoke the doctrine." Id. at 172.
The inquiry here is thus whether in making the statements at issue here Blumenthal acted sufficiently outside the normal scope of his statutory authority to invoke the doctrine of sovereign immunity. This inquiry necessarily begins with Conn. Gen: Stat. § 3-125, which defines the duties of the Attorney General. The statute is rather lengthy, but its central provisions, for purposes of the present case, are that "[[t]he Attorney General shall have general supervision over all legal matters in which the state is an interested party" and that "[h]e shall appear for the state . . . and for all heads of departments and . . . commissioners . . . in all suits and other civil proceedings . . . in which the state is a party or is interested. . . ."
Conn. Gen. Stat. § 3-125 nowhere states that the statutory duties of the Attorney General include making statements to the press. Does this mean that by making statements to the press the Attorney General has acted outside his statutory authority? An impressive line of cases from CT Page 12796 other jurisdictions establishes that the Attorney General has ample authority to make such statements.
The provenance of this authority dates to Spalding v. Vilas, 161 U.S. 483
(1896). Spalding sustained the ability of the Postmaster General to write a notice to claimants calling their attention to an act of Congress and giving his interpretation of that act. The Supreme Court concluded that "the same general considerations of public policy and convenience which demand for judges of courts of superior jurisdiction immunity from civil suits for damages arising from acts done by them in the course of the performance of their judicial functions, apply to a large extent to official communications made by heads of Executive Departments when engaged in the discharge of duties imposed upon them by law." Id. at 498.
In the decades following Spalding, the scope and frequency of "official communications" made by the heads of Executive Departments increased significantly. By 1940, Vinson, J. (later Chief Justice Vinson) could say that, "The practice of cabinet officers to issue public statements in respect to the activity of their departments is too well known to require comment. Indeed, such announcements serve a useful if not essential role in the functioning of the democratic processes of government." Glass v.Ickes, 117 F.2d 273, 278 n. 9 (D.C. Cir. 1940), cert. denied, 311 U.S. 718
(1941). The reach of Spalding was expanded by Barr v. Matteo, 360 U.S. 564
(1959). Barr was a defamation action brought against the acting director of the Office of Rent Stabilization by two employees whose suspension for misconduct he had announced through a press release. The Court found it to be "an appropriate exercise of the discretion with which an executive officer is necessarily clothed to publish the press release here at issue." Id. at 574.
The Spalding line of cases has been applied to Attorneys General at least since Matson v. Margiotti, 88 A.2d 892 (Pa. 1952). Matson was a McCarthy era case involving a particularly outrageous set of facts. The Pennsylvania Attorney General wrote a letter to a district attorney alleging that an assistant district attorney in his employ was a Communist. The Attorney General maximized the harm he intended to cause by releasing the letter to the press before delivering it to the district attorney. Citing Spalding and Glass (Barr had not yet been decided), the Supreme Court of Pennsylvania held that the release of the letter to the press was within "the scope of the Attorney General's official duties."88 A.2d at 900. The court reasoned that "it is in the public interest to permit an Attorney General to keep the public advised of his official acts and conduct where such actions are in the course of and within the scope of his official duties or powers." Id.
CT Page 12797 Disturbing as the factual situation in Matson was, the analysis of the case is consistent with that of Spalding and Barr. Matson's holding that an Attorney General's press releases are within the scope of his duties remains the accepted law on the subject. Press releases continue to be considered "within the outer perimeter of the prosecutor's authority and discretion." Blake v. Rupe, 651 P.2d 1096, 1106 (Wyo. 1982), cert. denied, 459 U.S. 1208 (1983). Accord Turner v. Baxley, 354 F. Sup. 963,972 (D.Vt. 1972); Levinsky v. Diamond, 559 A.2d 1073, 1079-80 (Vt. 1989), overruled on other grounds by Muzzy v. State, 583 A.2d 82 (Vt. 1990).
The plaintiffs principally rely on Rule 3.6 of the Rules of Professional Conduct. Rule 3.6(a) provides that, "A lawyer shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding." Blumenthal, an attorney, is bound by Rule 3.6. The administrative matter about which he commented was, moreover, a form of "adjudicative proceeding." But the context of the comments at issue here is not the factual context that Rule 3.6 was designed to address. The limitations of Rule 3.6 "are aimed at two principal evils: (1) comments that are likely to influence the actual outcome of the trial, and (2) comments that are likely to prejudice the jury venire." Gentile v. State Bar, 501 U.S. 1030, 1075
(1991). Neither of these evils was present here. The comments at issue concerned an administrative hearing that would eventually be heard by a hearing officer rather than a jury. As Satter, J. has found, there is no reason to expect that Blumenthal's comments would be likely to influence the actual outcome of this proceeding. For the same reason, the comments at issue would obviously have no effect on a jury venire.
In any event, this is not a case in which a professional grievance has been filed against the defendant. The plaintiffs argument here is not that Blumenthal should be disciplined for his comments but that Rule 3.6 limits the power of the Attorney General's office. This argument is unpersuasive. Rule 3.6 does not purport to limit the power of any public officer. The rule instead visits certain professional consequences on any attorney — public official or not — who violates it. But because the evidence does not support the proposition that the rule was violated here, this argument need not be further discussed.
For the reasons discussed above, the doctrine of sovereign immunity applies to the claim against the defendant in his official capacity. For reasons also discussed above, it does not appear that a claim has been brought against the defendant in his personal capacity. To the extent that a personal capacity claim exists, however, the plaintiffs fare no CT Page 12798 better. Shay v. Rossi, supra, explains that, in cases involving both official capacity and personal capacity claims, the question of statutory immunity for the personal capacity claim is to be reached only "if sovereign immunity does not apply to the claim against [the official] in [his] official capacity." 253 Conn. at 162. In this case, sovereign immunity does apply to the claim against the defendant in his official capacity. Even if the question of statutory immunity were to be reached, the plaintiffs have failed to establish that the defendant's conduct was "wanton, reckless or malicious," so as to fall within the exception to the statutory immunity for such conduct. See id. at 180-81. In this case, the views of the Attorney General and DSS concerning the illegality of the plaintiffs' conduct have been upheld by a hearing officer and the Superior Court. Hultman v. State, supra. The adjectives with which this conduct can be described are entirely a matter of opinion. Nothing in the evidence establishes that the defendant's choice of adjectives was in any way "wanton, reckless, or malicious."
The motion to dismiss is granted
Jon C. Blue Judge of the Superior Court