**BANK OF AMERICA NAT. TRUST & SAVINGS ASS'N v. DOUGLAS et al.**

No. 7354.

United States Court of Appeals for the District of Columbia.

Argued March 30, 1939.

Decided May 8, 1939.

William Stanley, of Washington, D. C., T. W. Dahlquist, of San Francisco, Cal., and Charles W. Collins and Donald R. Richberg, both of Washington, D. C., for appellant.

Chester T. Lane, of Washington, D. C., for appellees.

Before GRONER, Chief Justice, and EDGERTON and VINSON, Associate Justices.

## GRONER, C. J.

Plaintiff Bank brought this suit against the members of the Securities and Exchange Commission to prevent the public disclosure by the Commission of information claimed to have been illegally obtained and for injunction restraining the Commission from enforcing subpoenas requiring the production of the records of the Bank.

Plaintiff is a national bank, a member of the Federal Reserve System, with deposits insured by the Federal Deposit Insurance Corporation, and has its principal place of business in San Francisco, California. It has outstanding capital stock of $50,000,000, has total capital assets in excess of $114,000,000, and does business in 308 communities in the State of California through its main office and its branches.

Transamerica Corporation (not a party to this suit) owned practically the entire voting stock of the Bank prior to July 15, 1937, but on that date distributed to its own stockholders all but 42%, which it still retains.

None of the Bank's stock is registered on any national securities exchange.

Transamerica in August, 1937, filed with Securities Commission an application for registration of 11,590,784 shares of its own capital stock of the par value of $2 per share. The registration became effective the following September 10. Since Transamerica had owned all of the Bank's capital stock during the years 1934-36, its application included balance sheets, profit and loss statements, and other financial information with respect to the Bank for those years—furnished substantially in the same form as the report of condition of the Bank filed with the Comptroller of the Currency.

In November, 1938, the Commission, in anticipation of proceedings to determine whether Transamerica's registration should be suspended, obtained from the Secretary of the Treasury permission to examine the reports of bank examiners made to the Comptroller of the Currency with reference to the Bank. Subsequently, in response to the Commission's request, the Secretary consented to the public official use of the information.

The Commission then issued an order directing that a public hearing be held in Washington on January 16, 1939. The Bank was not summoned or joined as a party, but the Commission caused a subpoena duces tecum to be served on the Bank's cashier in San Francisco, commanding him to appear within four days and bring with him records relating to numerous banking items and practices from 1929 to date; another subpoena was directed to the Bank's vice-president, commanding him to produce records from 1929 to date relating to nearly two hundred loans made by the Bank. The subpoenas admittedly were based upon information derived from the reports furnished by the Secretary. On the hearing day, the Bank filed this complaint, alleging that the proposed investigation of the Bank's affairs constituted an unlawful exercise of visitorial powers; that the Secretary had unlawfully given access to the bank examiners' reports; and that their publication as proposed by the Commission would irreparably injure the Bank. It prayed for a declaratory judgment and for an injunction.

The Commission answered, challenging the jurisdiction of the court and averring affirmatively that neither the action of the Secretary in furnishing the information

nor the act of the Commission in using it was contrary to law.

The trial court heard the cause on the merits and concluded: (1) that although the Commission intends at a public hearing to make its own appraisal and valuation of a substantial portion of the assets of the Bank and to make an investigation of the reserves of the Bank, such action does not constitute the exercise of any visitorial power over the Bank; (2) that even if such action is visitorial, it is within the lawful power of the Commission; (3) that although the evidence does not disclose that the bank examiners' reports have ever been furnished to any officer, agency, or department of the government for use in a public hearing without the consent of the bank involved, except for use in criminal proceedings, the Secretary of the Treasury was authorized to furnish them to the Commission for its public official use; and (4) that the court had jurisdiction and that the suit was not prematurely brought. Judgment was entered dismissing the complaint.

From what has been said, it is apparent that the issues concern: (1) the power of the District Court to grant the relief prayed; (2) the scope of the Commission's investigatory powers; (3) the right of the Commission to demand and receive and thereafter to disclose information contained in the reports of the bank examiners; and (4) the validity of the subpoenas issued by the Commission based on such information.

▆▆▆ First. We think the court had jurisdiction. The Bank alleged that disclosure of the information would result in irreparable injury. Since other remedy was entirely lacking, the cause was a proper one for equitable relief. Utah Fuel Co. v. National Bituminous Coal Commission (decided January 30, 1939), 59 S.Ct. 409, 83 L.Ed. 483. If the Bank had prayed solely for an injunction against enforcement of the subpœnas, the question would be different. Federal Trade Com'n. v. Millers' Nat. Federation, 60 App.D.C. 66, 47 F.2d 428; cf. Federal Power Com'n. v. Metropolitan Edison Co., 304 U.S. 375, 386, 58 S.Ct. 963, 82 L.Ed. 1408. But the complaint asks for other relief which a court of equity may grant, as well as for a declaratory judgment. " 'A court of equity ought to do justice completely and not by halves,' and to this end, having properly

acquired jurisdiction of the cause for any purpose, it will ordinarily retain jurisdiction for all purposes, including the determination of legal rights that otherwise would fall within the exclusive authority of a court of law". Rice & Adams Corp. v. Lathrop, 278 U.S. 509, 515, 49 S.Ct. 220, 222, 73 L.Ed. 480.

And since the case is one arising under the laws of the United States, the court had power to enter a declaratory judgment. Zenie Brothers v. Miskend, D.C., 10 F. Supp. 779.

Second. Sec. 19(a) of the Securities Exchange Act of 1934[1] authorizes the Commission, if in its opinion such action is necessary for the protection of investors—"(2) after appropriate notice and opportunity for hearing, by order to deny, to suspend the effective date of, to suspend for a period not exceeding twelve months, or to withdraw, the registration of a security if the Commission finds that the issuer of such security has failed to comply with any provision of this title or the rules and regulations thereunder."

Sec. 12(b) (1) requires as a condition of the registration of securities the filing with the Commission of—"Such information, in such detail, as to the issuer and any person directly or indirectly controlling or controlled by, or under direct or indirect common control with, the issuer, * * * as the Commission may by rules and regulations require, as necessary or appropriate in the public interest or for the protection of investors. * * *"

Sec. 21(a) authorizes the Commission in its discretion to make such investigation as it shall deem necessary to determine whether a registrant has violated any provisions of the Act or the rules of the Commission.

The Commission's order alleged that Transamerica had failed to comply with the provisions of Sec. 12(b) and the Commission's regulations, in that it had filed false and misleading statements of material facts, that is to say, a large amount of losses and doubtful accounts had been written off the books of the Bank by pretended sales to other subsidiaries of Transamerica and by write-ups of the value of investment securities; the figures for "loans and discounts" included a large number of worthless and doubtful accounts; the valuation of certain bonds included arbitrary

---

[1] 48 Stat. 881, 15 U.S.C.A. § 78a et seq.

write-ups; the depreciation figures for real estate were inadequate; the "reserve for contingencies" was misleading since there was no indication that it represented not only a self-insurance fund but a reserve for all the losses and doubtful accounts, and was therefore inadequate; the profit and loss statements included the write-ups but made no provision for the losses; as a consequence the Bank had paid out in dividends a large sum in excess of its actual current earnings.

■■■■ The Act, being primarily for the protection of investors, imposes civil liability[2] and criminal penalties[3] upon any person who knowingly makes false and misleading statements in an application for the registration of a security for sale on a national exchange. The purpose is to require complete and truthful exposure of all matters in relation to the registrant's financial condition. We do not doubt, therefore, that the Commission, in the exercise of its powers to enforce the Act, may inquire into the affairs of a company controlled by a registrant. And on the record in this case we are of opinion that Transamerica's interest in the Bank, past and present, brings the latter within the scope of that power.

Third. The next question turns upon the authority of the Secretary of the Treasury to furnish the Commission copies of the examiners' reports and whether, if there was authority, the information must be held in confidence.

Admittedly, there is no statute of prohibition.

According to a practice of long standing, the reports of bank examiners made to the Comptroller have been considered as private, and access to them for use by other government officials has been granted only in tax investigations and criminal prosecutions. In a number of instances Congress has specifically authorized use of reports "in confidence",[4] and the only statutory reference to publicity is in the Comptroller's qualified authority to publish the report on any bank which fails to comply with his recommendations.[5]

Other instances to show that by unbroken custom reports of bank examiners have been regarded as privileged are (1) the testimony of Chairman Douglas of the Commission in the hearings on the Barkley bill, to the effect that examiners' reports ought not to be made public;[6] (2) the testimony of the Comptroller in the Pujo investigation that the reports of examiners had always been regarded as confidential;[7] (3) legislation on the subject, where in each instance in which the rule was modified, Congress recognized the necessity of effecting it by express language even as to those agencies and instrumentalities authorized to deal with banks.[8] And to all of this may be added the uncontradicted testimony that examiners' reports had never at any previous time been publicly used in any civil proceeding. It is obvious, therefore, that this case presents a direct conflict in congressional purposes; for on the one hand the Securities Exchange Act vests in the Commission power to make examinations of registrants and their con-

---

[2] Sec. 18, 15 U.S.C.A. § 78r.

[3] Sec. 32(a), 15 U.S.C.A. § 78ff.

[4] Federal Farm Loan Act: The Comptroller is "authorized and directed" to furnish his information concerning national banks and to make special examinations for the "confidential use" of any Federal Intermediate Credit Bank. 42 Stat. 1458, 12 U.S.C.A. § 1091.

Reconstruction Finance Corporation Act: The Comptroller is "authorized" to make available to the Corporation "in confidence" such information as he may have concerning applicants for loans. 47 Stat. 709, 714, 15 U.S.C.A. § 608.

Federal Home Loan Bank Act: The Comptroller is "authorized" to make available "in confidence" to the Home Loan Bank Board such information as he may have respecting institutions with which any Home Loan Bank may have transactions. 47 Stat. 739, 12 U.S.C. A. § 1442(a).

Federal Deposit Insurance Corporation Act: The Corporation's examiners may examine national banks only with the written consent of the Comptroller, and the Corporation is given access to information in possession of the Comptroller. 49 Stat. 693-694, 12 U.S.C.A. § 264 (k)(2-4).

[5] 12 U.S.C.A. § 481.

[6] Hearing, Senate Committee on Banking and Currency, S. 2344, 75 Cong. 1 Sess. (1937), p. 71.

[7] Hearings, House Committee on Banking and Currency, H.R. 429 and 504 (1912-1913), Money Trust Investigation, 62 Cong. 2 Sess., Vol. 2, pt. 19, p. 1391.

[8] See note 4, supra.

trolled companies without excepting banks and, as part of its power, to compel the production of their books, records and papers for scrutiny by the Commission—whereas on the other, the National Banking Act,[9] in deference to the delicate and sensitive interests involved, contemplates exclusive supervision of banks by the Comptroller of the Currency and the confidential treatment by him of the matters developed as to their internal affairs.

And this brings us back to the question with which we began this inquiry—the authority of the Secretary of the Treasury to furnish the information in question and, assuming that, whether it should be published by the Commission. The first part of the question was answered in the affirmative by Attorney General Wickersham on an inquiry from the President relative to the Money Trust or Pujo Committee Investigation in Congress. After a comprehensive review of the duties and powers of the Comptroller, he said: "Thus the banking laws clothe the Comptroller with authority to examine into the affairs of national banks for three main purposes: First, to ascertain the financial condition and soundness of management of national banks; second, to determine whether or not such banks are operating in conformity with the banking laws; third, to enable him to recommend amendments to the existing law. Nowhere in the law is there any express provision that the information thus acquired by the Comptroller shall be confidential. While, if in your opinion, the interests of the Government require that this information shall be so treated, you have the right to refuse to divulge it (Boske v. Comingore, 177 U.S. 459, 469 [20 S.Ct. 701, 44 L.Ed. 846]), yet, I am clearly of the view that if, in your opinion, it is proper to give this information to the House committee you have the lawful power to do so." 29 Op. Atty. Gen. 555, 560.

■ The Commission insists that equal power is lodged in the Secretary by R.S. 161,[10] which authorizes the head of each Department to prescribe regulations not inconsistent with law for the custody, use, and preservation of its records and papers. We think this is correct, and that the power includes the right to determine whether records may be withdrawn and used by other departments. In this view and since the Comptroller's records are within the Treasury Department and the Comptroller, by statute, is under the general direction of the Secretary,[11] it follows that no distinction can be made between the two classes of records. See, generally, 25 Op. Atty. Gen. 326; 35 Op. Atty. Gen. 5. Without more, therefore, we hold that the act of the Secretary in furnishing the Commission with the reports of the bank examiners in the present case "was not inconsistent with law".

■ Whether the information so furnished should be used by the Commission only for the purpose of conducting its inquiry into the financial affairs of the Bank or whether its use was unrestricted, presents a more difficult problem. As we have already pointed out, the unbroken administrative practice of the Secretary and the Comptroller, as well as the course of Congressional legislation, manifests a fixed purpose to confine the outside use of such information to criminal prosecutions, tax suits, and the like. And this is true because of the nature of banking, as to which, by universal recognition, public confidence is essential. The plenary power of the Comptroller over the conduct of the business and affairs of banks always has been considered ample to assure reasonable protection to depositors and the public.[12]

In the instant case it is said by the Bank that the Commission has already made public much of the information obtained from the examiners' reports. In this respect the record shows that the Commission, upon receiving the permission of the Secretary to make "public official use" of the reports, made an order for a hearing before one of its examiners to determine whether Transamerica had violated any of the provisions of the Act. The order, which was released to the public, set out the particulars of the subjects to be investigated, together with all of the facts believed by the

[9] R.S. § 5133 et seq., 12 U.S.C.A. § 21, et seq.

[10] 5 U.S.C.A. § 22.

[11] R.S. § 324, 12 U.S.C.A. § 1.

[12] The Reconstruction Finance Corporation has announced that in transactions between the corporation and a bank it will be guided by the reports of the latter to the Comptroller.

Hearings, House Committee on Banking and Currency, H.R. 5357, 74 Cong. 1 Sess. (1935), p. 135.

Commission to show the respects in which Transamerica's statement of the condition of the Bank was untrue. The specifications of alleged misconduct are so serious in their implications as to warrant the Commission in characterizing them as having, potentially, criminal aspects "which may yet lead to criminal prosecutions" and are set out in such meticulous detail as, backed by the great power of the Commission, to cause serious prejudice to the Bank and bring it, in advance of any hearing, into public disrepute. The Securities Exchange Act authorizes the Commission in its discretion to make investigations and to make public its findings, but there is nothing in the Act which authorizes publicity in advance of hearing. In the present case the order was made pursuant to Sec. 19(a) (2) of the Act, 15 U.S.C.A. § 78s, which empowers, after notice and hearing, suspension or cancellation of the registration statement. Under regulations prescribed by the Administrative Committee of the Federal Register, notices of hearing must be published in the Register, but the rule does not require the publication as part of such notice of the evidentiary facts; and where, as in this case, the latter are obtained from confidential sources, neither the purpose nor intent of the Act contemplates their broadcast to the public. It is not difficult to see that such a power might easily be made an instrument of oppression and, lacking specific congressional authorization, we think it ought not to be indulged. In addition to this, pretrial publication of evidence—labeled as believed to be true—ought, we think, to be avoided, especially as emanating from the tribunal charged with the judicial responsibility of weighing it and assuring the accused a fair hearing. And, if this is the correct view, it is particularly pertinent here, for after all the Bank is not a party in the proceeding instituted by the Commission. Its connection with the investigation grows wholly out of the fact that its largest stockholder, Transamerica, in certifying its own financial condition, is believed by the Commission to have violated the provisions of the Securities Exchange Act. So far as the Bank is concerned, even if the charge,

as to it, is true, any possible violation by it of the banking laws, is a matter not within the Commission's reach. And certainly until findings are made, the Bank is entitled to have judgment, public and official, suspended. This does not suggest or contemplate that the government should be hampered or restrained in its investigation or in its prosecution of violations of the laws, or that in this case the Commission, under its duty to develop the actual facts by which to test the bona fides of the Bank's financial statement, should be circumscribed in their proper pursuit.

And so, as we think, while it must be decided that the Secretary was authorized to deliver the reports, their use should be confined to an investigation of the charges in proper proceedings by the Commission in the discharge of its duties under the Act. And this the Commission now assures us is the length and breadth of the purpose it has in mind. It says that it does not desire or intend to introduce the reports in evidence and that it will not make them public by any other means. This assurance we accept as conclusive of this branch of the case, and relying upon it we hold that the Commission may use the information at hand in preparation for the hearing and to aid it in obtaining the evidence believed by it to be necessary and proper in the hearing on its notice to Transamerica to show cause why its registration statement should not be suspended. In saying this, we are not holding that the Commission has any "visitorial" power over the Bank,[13] or that it has the slightest right to manage or control the Bank's affairs or policy, or to do any of those things which are visitorial in character. If in the discharge of its duty to hold hearings and make findings business secrets are necessarily disclosed, the result is attributable only to the necessity of carrying out the purposes of the Act. The difference between this and the exercise of visitorial powers, which are restricted by Congress to itself and certain particular agencies of government, is pointed out in First Nat. Bank of Youngstown v. Hughes, C.C., 6 F. 737, in this language: "Visitation, in law, is the act of a superior or superintending officer, who

---

[13] 12 U.S.C.A. § 484: "No bank shall be subject to any visitorial powers other than such as are authorized by law, or vested in the courts of justice or such as shall be or shall have been exercised or directed by Congress, or by either House thereof or by any committee of Congress or of either House duly authorized. (R. S. § 5240; Feb. 19, 1875, c. 89, 18 Stat. 329; Dec. 23, 1913, c. 6, § 21, 38 Stat. 271.)"

visits a corporation to examine into its manner of conducting business, and enforce an observance of its laws and regulations. Burrill defines the word to mean 'inspection; superintendence; direction; regulation.' The exercise of no such authority is contemplated by defendants. They do not contemplate inspection, supervision, or regulation of complainant's business, or an enforcement of its laws or regulations. On the contrary, their purpose is to ascertain, in a legal way, and by legitimate testimony, whether any person had, at the time mentioned, on deposit with complainant any money subject to taxation in said county which had not been returned by the owners thereof for that purpose. Hence, the subpœna commanding the production of the complainant's books, in the manner and for the purpose stated, is not an exercise of 'visitorial powers;' * * *." Pages 740, 741.

This distinction is recognized and approved in Guthrie v. Harkness, 199 U.S. 148, 158, 26 S.Ct. 4, 50 L.Ed. 130, 4 Ann. Cas. 433. But the Bank objects that, even if this is so, speaking generally, it does not apply here for the reason that the controlled company is a bank, and because banks are under the direction of the Comptroller, any examination by the Commission into its affairs is a duplication of supervision which ought not to be countenanced. The answer to this is that the value of the assets of Transamerica depends in large measure on the value of its shareholding in the Bank. An investigation of the one which did not include also an investigation of the other would be futile, and in this view we are unable to find anything, either in the statutes or in reason, to justify putting the Bank in a class by itself. The Bank insists this is done by Sec. 13(b) of the Act, 15 U.S.C.A. § 78m, but we do not so read the section. It provides that the Commission may prescribe the form in which the required information shall be set forth—"but in the case of the reports of any person whose methods of accounting are prescribed under the provisions of any law of the United States, or any rule or regulation thereunder, the rules and regulations of the Commission with respect to reports shall not be inconsistent with the requirements imposed by such law or rule or regulation in respect of the same subject matter * * *."

The Bank argues that, since it is required by the National Banking Act to file with the Comptroller a "report of its condition", it is "inconsistent" to require Transamerica to file a different report with the Commission. The reasonableness of this argument may be conceded, and yet not reach the heart of the question. For here it is not a question of form or of the adoption of a different method of accounting. In all of these respects—as well as in the manner of appraisal of assets—the Bank must follow the Comptroller's orders. And if Transamerica can show the Bank's compliance therewith, we may assume the Commission would have no right to substitute its opinion in place of the Comptroller's. But that is matter for another day. The Comptroller's opinion of the Bank's practices does not appear. The case we have concerns a charge that items involving large sums of money have by fictitious transfers between the Bank and its branches and other subsidiaries of Transamerica been made to reflect an incorrect value in the Bank's assets and reserves, so that its footings are consequently unreal and untrue. To deny the right to investigate this charge and make public findings in relation thereto, would be destructive of the basic purpose of the Act.

Fourth. This brings us then, to the question whether the subpœnas in their present form are so limitless in their scope as to make them unreasonable. The one to Ferrari commands him to bring from San Francisco to Washington, all loan and discount records, collateral records, appraisal records, charged off loan and discount records, loan approval records, and any other books of account not heretofore enumerated together with all supporting data and records of correspondence for and covering the period from January 1, 1929, to January 13, 1939. The only limit to this requirement is that the books relate to matter concerning some two hundred loans in the Bank and its branches.

The subpœna to Smith commands him to bring to Washington all records of loans and discounts, records of assets other than loans and discounts, records of collateral, records of charged off loans and discounts, records of charged off assets other than loans and discounts, loan approval records, investment records, records of inter-company accounts, general and expense ledgers, payroll and expense records, and any other books of account and records in support thereof not heretofore enumerated, records of appraisal, real estate tax bills, insurance policies, receipted bills and ex-

pense vouchers, contracts, guarantees, options, pledges and other agreements, minute books and records of correspondence, for and covering the period from January 1, 1929, to January 10, 1939, which relate to payments and credits to A. P. Giannini; to agreements in relation to assets amounting to thirty-five million dollars previously carried on the books; the character of such assets; the collateral pledged for them; the obligations created under sundry agreements for reduction of the obligations or guarantees thereof; loans and discounts, including losses, doubtful and slow accounts, write-ups of United States and municipal securities; the accounting methods employed to reflect such write-up; the character of the reserve maintained for contingencies; the adequacy of this reserve to cover self-insurance; losses on real estate; depreciation of bank premises, furniture, fixtures; losses on bonds and other securities; the amount and character of foreign exchange and credits held abroad; agreements between the Bank and subsidiaries of Transamerica relating to charged-off assets; sale, transfer, assignment, assumption of the guarantees of rights or liabilities under the agreements; repurchase guarantees; an agreement between the Bank and Transamerica relating to 56,000 shares of National City Bank stock; the manner of creation, treatment, and adequacy of the reserves set up on the books of the Bank and its predecessors and the charges thereto. It is perfectly clear, we think, that compliance with these demands will, for all practical purposes, close the Bank, and it is equally clear that by transferring the place of hearing from Washington to San Francisco the Commission may carry on its investigation without unduly and unreasonably hampering the Bank in its business. If this is so, then any other course is so unreasonable as to require correction. In Hale v. Henkel, 201 U.S. 43. 26 S.Ct. 370, 50 L.Ed. 652, the Supreme Court had before it a similar case, which is well described in the following quotation:

"Applying the test of reasonableness to the present case, we think the subpœna duces tecum is far too sweeping in its terms to be regarded as reasonable. It does not require the production of a single contract, or of contracts with a particular corporation, or a limited number of documents, but all understandings, contracts, or correspondence between the MacAndrews & Forbes Company, and no less than six different companies, as well as all reports made and accounts rendered by such companies from the date of the organization of the MacAndrews & Forbes Company, as well as all letters received by that company since its organization from more than a dozen different companies, situated in seven different states in the Union. If the writ had required the production of all the books, papers, and documents found in the office of the MacAndrews & Forbes Company, it would scarcely be more universal in its operation, or more completely put a stop to the business of that company. Indeed, it is difficult to say how its business could be carried on after it had been denuded of this mass of material, which is not shown to be necessary in the prosecution of this case, and is clearly in violation of the general principle of law with regard to the particularity required in the description of documents necessary to a search warrant or subpœna. Doubtless many, if not all, of these documents may ultimately be required, but some necessity should be shown, either from an examination of the witnesses orally, or from the known transactions of these companies with the other companies implicated, or some evidence of their materiality produced, to justify an order for the production of such a mass of papers. A general subpœna of this description is equally indefensible as a search warrant would be if couched in similar terms." 201 U.S. pages 76, 77, 26 S.Ct. page 380, 50 L.Ed. 652.

While it is true the Act authorizes the Commission to subpœna witnesses from any part of the United States, we think it a fair statement that Congress never intended that the power should be exercised to bring from one side of the country to the other the principal officers of a bank and the books and records covering a period of ten years to appear before an examiner of an administrative commission. The right to be free of suit except in the District of which one is an inhabitant is a fixed part of our federal judicial history.[14] Its statutory requirement arose out of the experience of colonial days. Its wisdom has been proved in the passage of time, and no more obvious reversal of its spirit could be cited than is shown in the facts of this case. For all of these

---

[14] Sec. 51, Judicial Code, 28 U.S.C.A. § 112.

reasons, we are of opinion the subpœnas are unreasonable under the rule laid down in Hale v. Henkel, supra. Federal Trade Com'n. v. American Tobacco Co., 264 U. S. 298, 44 S.Ct. 336, 68 L.Ed. 696, 32 A.L. R. 786; Mobile Gas Co. v. Patterson, D.C., 288 F. 884; Id., D.C., 293 F. 208, 228; Cudahy Packing Co. v. United States, 7 Cir., 15 F.2d 133.

We therefore hold:

1. That the delivery to the Commission by the Secretary of the Treasury of the examiners' reports was authorized and legal;

2. That their use in proceedings to obtain the necessary facts and information whereby to carry out the investigatory function of the Commission, is proper;

3. That except to the extent necessary to carry out the purpose just above mentioned the reports should be treated as confidential; and

4. That the subpœnas in their present form are unreasonable and should not be enforced.

We, therefore, remand to the trial court, with instructions to revoke the decree dismissing the complaint. But the Commission, by counsel, having given assurances that the examiners' reports will not be given publicity except as authorized in this opinion and the subpœnas having expired by limitation and being now ineffective, no injunction need issue. The cause will remain on the trial docket of the District Court with the right to the Bank to apply for further relief if it should become necessary by subsequent events contrary to the views expressed herein.

Affirmed in part; reversed in part; and remanded.