**JOINT ANTI–FASCIST REFUGEE COM-
MITTEE v. CLARK, Attorney
General et al.**

No. 10002.

United States Court of Appeals
District of Columbia Circuit.

Argued March 16, 1949.

Decided Aug. 11, 1949.

Mr. O. John Rogge, Washington, D. C., with whom Messrs. Murray A. Gordon and Robert H. Goldman, New York City, were on the brief, and Mr. Benedict Wolf, New York City, for appellant.

Mr. Edward H. Hickey, Special Assistant to the Attorney General, with whom Messrs. H. G. Morison, Assistant Attorney General, George Morris Fay, United States Attorney, and Richard E. Guggenheim, Attorney, Department of Justice, Washington, D. C., were on the brief, for appellees.

Messrs. Carl W. Berueffy, Washington, D. C., Osmond K. Fraenkel and James L. Fly, New York City, were on the brief for the American Civil Liberties Union as amicus curiae, urging reversal.

Before EDGERTON, CLARK and PROCTOR, Circuit Judges.

PROCTOR, Circuit Judge.

This appeal is from an order of the District Court dismissing the complaint of the Joint Anti-Fascist Refugee Committee, appellant, (an unincorporated association alleged to be engaged in raising and distributing funds for relief of anti-fascist refugees) hereafter referred to as Committee, against Tom C. Clark, as Attorney General

of the United States, Seth W. Richardson, as Chairman of the Loyalty Review Board of the United States Civil Service Commission, and other named members of said Board, hereafter referred to as Board.

The complaint is based upon the action of the Attorney General, without notice or hearing, in designating the Committee as an organization falling under Part III, Section 3, of Executive Order 9835, 5 U.S.C.A. § 631 note, 12 Fed.Reg.1935, March 21, 1947, and listing its name as such in a letter to the Board, and the action of the Board in distributing the letter and list to departments and agencies in the executive branch of the Government and releasing the same to the public press. The foregoing steps were taken pursuant to directions of the President in said Executive Order 9835. The declared purpose of this order is to assure the employment of persons loyal to the United States. To that end it prescribes detailed procedures for the administration of an employees loyalty program in the executive branch of the Government, involving investigation of officers and employees therein and applicants for employment. The order recites that it is based upon authority vested in the President by the Constitution and statutes, including the Civil Service Act of 1883, 22 Stat. 403, as amended, and Section 9A of the Hatch Act, approved August 2, 1939, 18 U.S.C.A. § 61i, now 5 U.S.C.A. § 118j, and by authority of the President as Chief Executive of the United States, in the interests of the internal management of the Government. Section 9A of the Hatch Act provides:

"(1) It shall be unlawful for any person employed in any capacity by any agency of the Federal Government, whose compensation, or any part thereof, is paid from funds authorized or appropriated by any Act of Congress, to have membership in any political party or organization which advocates the overthrow of our constitutional form of government in the United States.

"(2) Any person violating the provisions of this section shall be immediately removed from the position or office held by him, and thereafter no part of the funds appropriated by any Act of Congress for such position or office shall be used to pay the compensation of such person."

Part III, Section 3, of the order provides that the Board shall currently be furnished by the Department of Justice with the name of each organization "which the Attorney General, after appropriate investigation and determination, designates as totalitarian, fascist, communist or subversive, or as having adopted a policy of advocating or approving the commission of acts of force or violence to deny others their rights under the Constitution of the United States, or as seeking to alter the form of government of the United States by unconstitutional means." By sub-section "a" Part III, Sec. 3, the Board is directed to "disseminate such information to all departments and agencies." The order further provides that among activities and associations of an applicant or employee, which may be considered in determining disloyalty, are membership in, affiliation with or sympathetic association with any of the organizations designated by the Attorney General. Executive Order 9835, Part V, Sec. 2, f, 5 U.S. C.A. § 631 note. In his letter to the Board the Attorney General, in designating the Committee classified it under Part III, Section 3, of the Executive Order. For brevity, we refer to the several groups indicated therein under the general term "subversive," although the Attorney General did not specifically so designate the Committee. In the foregoing letter, the Attorney General reiterates an admonition by the President that membership in or association with a designated organization "is simply one piece of evidence which may or may not be helpful in arriving at a conclusion as to the action which is to be taken in a particular case." The complaint contains no express denial that the Committee falls within the designation made by the Attorney General. In view of the extraordinary relief sought by way of equity a denial would seem to be appropriate. This is, in no sense, a simple action for libel.

The gist of the complaint is that Section 9A of the Hatch Act, "as applied by" the Executive Order, and the order itself are unconstitutional, and that the actions of the

Attorney General in designating and listing the Committee as subversive, and of Richardson in disseminating and publishing the list have caused the Committee to suffer loss of reputation and "business and patronage," including contributions from former and potential contributors, especially present and prospective civil servants; also to be deprived of its tax exempt status as a charitable organization; to be refused necessary licenses to solicit funds; to be hampered in obtaining places and supporters to carry on its fund-raising activities, and its "members and others" to be disgraced to their "economic injury," and discouraged in continuing their activities in its behalf, all to its irreparable damage. Those are the only direct allegations of damage or loss of rights suffered by the Committee. Nevertheless the complaint goes on to charge that the foregoing actions of defendants were "without warrant in law and amount to a deprivation of the rights of the plaintiff in violation of the Constitution * * *" and that Section 9A of the Hatch Act is void as applied by Executive Order 9835, because a deprivation of freedom of speech, of the press and of assembly and "association" (1st Amendment), of reserved rights of the people (9th and 10th Amendments) and of liberty and property without due process of law (5th Amendment). Wherefore, the Committee seeks a judgment declaring Section 9A of the Hatch Act, "as applied by Executive Order #9835," and the order itself, to be unconstitutional; also for broad injunctive relief to annul the alleged illegal acts of the Attorney General and the Board and overcome their ill effects. The motion to dismiss is laid upon the ground that the complaint fails to state a justiciable controversy or a claim upon which relief can be granted.

 We are convinced that the complaint does not present a justiciable controversy. The Executive Order imposes no obligation or restraint upon the Committee. It commands nothing of the Committee. It denies the Committee no authority, privilege, immunity or license. It subjects the Committee to no liability, civil or criminal. Cf. United States v. Los Angeles &

S. L. R. Co., 1927, 273 U.S. 299, 309, 310, 47 S.Ct. 413, 71 L.Ed. 651. Nor does the designation by the Attorney General have any such effect. His letter to the Board simply complies with the directions of the President in whose behalf he was acting. He has done for the President only that which the President could have done for himself. Had the President done so his action would have been within the realm of his executive power, not subject to judicial review. Marbury v. Madison, 1803, 1 Cranch. 137, 164–166, 5 U.S. 137, 164–166, 2 L.Ed. 60; Keim v. United States, 1900, 177 U.S. 290, 293, 20 S.Ct. 574, 44 L.Ed. 774; Humphrey's Executor v. United States, 1935, 295 U.S. 602, 629-630, 55 S.Ct. 869, 79 L.Ed. 1611.

The letter of the Attorney General and his list of designated organizations were furnished the Board only by way of information and advice. That is made clear by the terms of the Executive Order and the letter of the Attorney General. They cannot be put in the category of laws or regulations within the meaning of constitutional prohibitions against abridgement of the rights of the people. The case is much like that of Standard Computing Scale Company v. Farrell, 1919, 249 U.S. 571, 39 S.Ct. 380, 63 L.Ed. 780, where an injunction was sought against issuing certain scale specifications, injurious to plaintiff's business, upon the claim that it would constitute an invalid exercise of police power and violate constitutional rights and privileges. In upholding dismissal of the bill, the Court says, 249 U.S. at page 575, 39 S.Ct. at page 381:

"The information given in the 'specifications' complained of may, as the plaintiff contends, be incorrect; the instruction may be unsound, and, if it is so, may be mischievous and seriously damage the property rights of innocent persons. But the opinions and advice, even of those in authority, are not a law or regulation such as comes within the scope of the several provisions of the federal Constitution designed to secure the rights of citizens as against action by the States." See also United States v. Los Angeles & S. L. R. Co., supra. In Employers Group of Motor Freight Car-

riers v. National War Labor Board, 1944, 79 U.S.App.D.C. 105, 143 F.2d 145, where it was sought to annul and enjoin a "directive order" of said Board, this court, speaking through Judge Edgerton, said:

"No money, property, or opportunity has been taken or withheld from the appellants, and no one threatens any such act. No one threatens, and no one could maintain, either judicial or administrative proceedings against the appellants upon the authority of the Board's order." 143 F.2d at page 147.

"Any action of the Board would be informatory and 'at most, advisory.' Appellants' demand that we annul and enjoin the Board's order therefore amounts to a demand that we prevent the Board from giving the President advice which appellants contend would be erroneous. A court might as well be asked to prevent the Secretary of State or the Attorney General from giving alleged erroneous advice. The correctness of administrative advice cannot be reviewed by the courts. They have neither the necessary·authority nor the necessary qualifications for such work." 143 F.2d at page 151, citing Standard Computing Scale Company v. Farrell, supra. See also National War Labor Board v. United States Gypsum Co., 1944, 79 U.S.App.D.C. 239, 145 F.2d 97.

At most, any injury to the Committee is indirect—purely incidental to the objects and purposes of the loyalty program. Under these circumstances neither the Attorney General nor the Board can be restrained from carrying out the directions of the President looking to distribution of the information to interested departments and agencies—steps essential in carrying out the program.

■ The complaint that the information was disclosed to the public press presents no legal ground for relief. In the absence of a statute imposing secrecy, it cannot be supposed that the courts have any power to regulate or control publication of matters concerning the government's business. The responsibility and decision in each case must rest with the official in charge.

■ The contention that without a hearing in connection with the Attorney General's investigation and determination the Committee has been denied due process of law, disregards the purpose and effect of the Executive Order and the action of the Attorney General. They were not aimed at the Committee, but were necessary steps in executing the law and carrying out the loyalty program. It is not unusual for official action, intended for one purpose, to affect adversely others against whom it is not directed. But these unavoidable consequences cannot stay the hand of government. They afford no ground for judicial review. Perkins v. Lukens Steel Co., 1940, 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108; Ex-Cell-O Corp. v. City of Chicago, 7 Cir., 1940, 115 F.2d 627.

■ If the Committee means to assert claims in behalf of its members reputedly disgraced by reason of the designation, it is enough to point out that only the members themselves are entitled to complain of any personal injuries they may suffer. Likewise, only the members, not the Committee, can seek redress for alleged impairment of members' constitutional rights of freedom of speech and assembly. Those rights are personal to the individual members. Cf. Hague v. C. I. O., 1939, 307 U.S. 496, 527, 59 S.Ct. 954, 83 L.Ed. 1423; Northwestern National Life Ins. Co. v. Riggs, 1906, 203 U.S. 243, 255, 27 S.Ct. 126, 51 L.Ed. 168, 7 Ann.Cas. 1104; Western Turf Ass'n. v. Greenberg, 1907, 204 U.S. 359, 363, 27 S.Ct. 384, 51 L.Ed. 520. The Committee's declared purposes are altogether charitable, which would give it no authority to assert or protect constitutional liberties and privileges of its individual members.

Obviously, nothing here complained of legally affects the tax or licensing status. of the Committee. No declaration or mandate in this case could operate legally upon such matters. The Committee's recourse lies with the officials or the courts clothed with power to grant direct relief.

■ Holding, as we do, that no case has been stated for injunctive relief, it·follows.

in the circumstances presented by the complaint that there is no ground to justify a declaratory judgment such as the Committee asks. Nashville, C. & St. L. Ry. **v.** Wallace, 1933, 288 U.S. 249, 262, 53 S.Ct. 345, 77 L.Ed. 730, 87 A.L.R. 1191; Colegrove v. Green, 1946, 328 U.S. 549, 552, 66 S.Ct. 1198, 90 L.Ed. 1432.

We might rest our opinion here, without dealing with the constitutional questions raised. However, in view of the number of cases in this jurisdiction attacking validity of the loyalty program, it seems proper to dispose of questions of that nature which have been argued in this case. Therefore, we shall briefly state our views.

We do not doubt validity of Section 9A of the Hatch Act. Congress may prescribe qualifications of government employees and attach conditions to their employment. Friedman v. Schwellenbach, 1946, 81 U.S.App.D.C. 365, 159 F.2d 22, 24, certiorari denied, 330 U.S. 838, 67 S. Ct. 979, 91 L.Ed. 1285.

We do not doubt validity of the Executive Order. It is the President's duty to take care that the laws are faithfully executed. Article II, Section 3, Constitution. It is his right and his duty to protect and defend the government against subversive forces which may seek to change or destroy it by unconstitutional means. Vesting of the executive power in the President is essentially a grant of power to execute the laws. He cannot do so alone. He must have the aid of subordinates. Therefore, he must have the power to select others to act for him, under his direction, in executing the laws. Myers v. United States, 1926, 272 U.S. 52, 117, 47 S.Ct. 21, 71 L.Ed. 160. The Executive Order exhibits a proper effort by the President to carry out the provisions of Section 9A. It is an exercise of his power as head of the executive branch of government to protect the civil service from disloyal and subversive elements. See Corwin, The President—Office and Powers, 3rd Ed. 1948, 121-136. His directions contained in the Executive Order lay down the method he has chosen to discharge his duty in carrying out the objects and purposes of Section 9A and the Civil Service Act.

We do not doubt validity of the Attorney General's act. Had the President performed the task himself, his acts could not have been challenged legally. Marbury v. Madison; Keim v. United States; Humphrey's Executor v. United States, supra. The fact that they were done by the Attorney General, for and at the President's direction, does not change their essential character as acts of the President himself.

Contrary to the contentions of the Committee, nothing in the Hatch Act or the loyalty program deprives the Committee or its members of any property rights. Freedom of speech and assembly is denied no one. Freedom of thought and belief is not impaired. Anyone is free to join the Committee and give it his support and encouragement. Everyone has a constitutional right to do these things, but no one has a constitutional right to be a government employee.

The order of the District Court dismissing the complaint is

Affirmed.

EDGERTON, Circuit Judge (dissenting).

The facts have not been tried and we know nothing about them. Appellant may be charitable as it says or subversive as appellees' ruling says. By moving to dismiss appellant's complaint on the ground it did not state a justiciable controversy or a claim on which relief could be granted, appellees elected to try only the sufficiency and not the truth of appellant's statements of fact. Since the District Court granted the motion to dismiss, appellant's statements must be assumed to be true for purposes of this appeal. No other facts are before us.

According to appellant's complaint: "Plaintiff, an unincorporated association located in the City and State of New York, is a charitable organization engaged in relief work. * * * The aims and purposes of the plaintiff organization are to. raise, administer and distribute funds for

the relief and rehabilitation of Spanish Republicans in exile and other anti-fascist refugees who fought in the war against Franco. Before the end of the war in Europe, this relief consisted of: (1) the release and assistance of those of the aforesaid refugees who were in concentration camps in Vichy France, North Africa and other countries; (2) transportation and asylum for those of the aforesaid refugees in flight; (3) direct relief and aid, to those of the aforesaid refugees requiring help, through the Red Cross and other international agencies. At the present time, the Joint Anti-Fascist Refugee Committee relief work is principally devoted to aiding those Spanish Republican refugees, and other anti-fascist refugees who fought against Franco, located in France and Mexico. Pursuant to its aims and purposes, the plaintiff organization has, from its inception in 1942 through the end of 1947, disbursed a total of $1,011,-448.00 in cash and $217,903.00 in kind for the relief of anti-fascist refugees and their families. The relief included money, food, shelter, educational facilities, medical treatment and supplies, and clothing to recipients in France, North Africa, the Dominican Republic, Portugal, Switzerland, Cuba, Venezuela, Mexico, the Netherlands, Spain, and the United States.

"By means of voluntary and paid assistance, the plaintiff organization has raised funds from contributors at social affairs, rallies, meetings, dinners, theatre parties, etc. In order to carry on the aforesaid work, plaintiff has built up and is dependent upon the continued good will of the people of the United States and upon the continued maintenance of its reputation of engaging in relief work for the benefit of anti-fascist refugees."

According to the complaint: the appellees, purporting to act under an Executive Order, have issued for the guidance of government officials in employing and discharging employees a ruling that the appellant is "subversive".[1] They issued this ruling without giving appellant any notice or hearing. They gave it wide publicity. It has caused appellant to lose reputation, members, supporters, contributions from government employees and others, valuable privileges, speakers, and meeting places. It has caused appellant's members to be subjected to ridicule, obloquy and economic loss.

However indefinite the word "subversive" may be, it is more or less synonymous with "disloyal". It is highly defamatory. No common meaning of the term fits the appellant if the appellant's "aims and purposes" are what it says they are. In other words, if the complaint is true the appellant is not subversive. Whatever the actual facts may ultimately prove to be, it must be assumed for purposes of this appeal that appellees' ruling is not only damaging but contrary to fact.[2]

I. *The Executive Order.* Executive Order No. 9835,[3] on which appellees rely, provides in Part V that: "1. The stand-

---

1. The official announcement in 13 Fed.Reg. 1471, 1473, March 20, 1948, says: "The first group [of organizations] is reported as having been previously named as subversive by the Department of Justice * * * Under Part III, section 3, of Executive Order No. 9835, the following additional organizations are designated. * * * Joint Anti-Fascist Refugee Committee."

Some months after this suit was filed, appellees issued and published a ruling that appellant is "communist". 13 Fed. Reg. 6137, Oct. 21, 1948.

2. It is immaterial that, as the opinion of the court points out, the complaint "contains no express denial that the Committee falls within the designation." If the complaint did not, as it does, contain a denial by necessary implication, that also would be immaterial. No complaint based on defamatory words need allege that the words are false; it is for the defendant to allege and prove, if he can, that they are true. And regardless of the nature of the suit, things not asserted or admitted in the complaint cannot be treated as true on the present appeal even if they are not denied in the complaint.

If appellees had described appellant as "totalitarian, fascist, communist, or subversive * * *," and not specifically as "subversive", the difference would be immaterial, since either description is defamatory and, on this record, contrary to fact.

3. 12 Fed.Reg.1935 (1947).

ard for the refusal of employment or the removal from employment in an executive department or agency on grounds relating to loyalty shall be that, on all the evidence, reasonable grounds exist for belief that the person involved is disloyal to the Government of the United States.

"2. Activities and associations of an applicant or employee which may be considered in connection with the determination of disloyalty may include one or more of the following: * * * f. Membership in, affiliation with or sympathetic association with any foreign or domestic organization, association, movement, group or combination of persons, designated by the Attorney General as totalitarian, fascist, communist, or subversive, or as having adopted a policy of advocating or approving the commission of acts of force or violence to deny other persons their rights under the Constitution of the United States, or as seeking to alter the form of government of the United States by unconstitutional means.". 5 U.S.C.A. § 631 note, (1948 Supp.), 12 Fed.Reg.1935, 1938.

An organization of the aims and purposes asserted in the complaint is not "subversive" within the meaning of that term in the Executive Order. Whatever it means in other connections, in this connection the term describes organizations "sympathetic association" with which may be evidence "that the person involved is disloyal to the Government of the United States." Advocacy of revolution is disloyal to the government. Greater or equal loyalty to a foreign government is disloyal to the government of the United States. Nothing less is. Helping former Spanish Republicans is not evidence of disloyalty to the government of the United States.[4] A charitable organization such as the appellant must now be assumed to be is therefore not subversive in the sense in which the word is used in the Executive Order. Neither is it "totalitarian, fascist, communist, * * *" or otherwise within

the Order. On the present record, the Order does not justify appellees' ruling.

The Order fails for another reason to justify the ruling. The Order provides (Part III, § 3) that "The Loyalty Review Board shall currently be furnished by the Department of Justice the name of each foreign or domestic organization, association, movement, group or combination of persons which the Attorney General, *after appropriate investigation* and determination, designates as totalitarian, fascist, communist or subversive * * *."[5] (Emphasis added.) An investigation that may result in the making and publication of a defamatory ruling which limits employment throughout the government service, limits the freedom of government employees, and harms not only the appellant but many persons outside as well as within the service, is not appropriate unless it conforms to basic standards of fairness. These include notice and a hearing. If the complaint is true, appellant was given none.

Appellees' ruling is not only outside the Executive Order but outside the authority on which the Order is said to rest. Section 9A of the Hatch Act, 53 Stat. 1148, 18 U.S.C. 61i, now 5 U.S.C.A. § 118j, (1948 Supp.), forbids employment of members of an organization that "advocates the overthrow of our constitutional form of government in the United States." If the facts alleged in the complaint are true the appellant is not such an organization. The Civil Service Act, R.S. § 1753, 5 U.S.C.A. § 631, (1948 Supp.) authorizes the President to "prescribe such regulations for the admission of persons into the civil service of the United States as may best promote the efficiency thereof * * *." On the present record, appellees' ruling against appellant has no more tendency to promote the efficiency of the civil service than a similar ruling against the Republican party or the Methodist Church would have.[6]

4. It does not even oppose any known policy of the government. There is, moreover, nothing disloyal to the government in opposition to a known government policy. Practically any given government policy is opposed by many members of Congress.

5. Supra note 3, at 1938.

6. Since the ruling is not authorized by the Order, and is invalid for other reasons,

Moreover, the ruling is invalid on constitutional grounds.

II. *Due process of law.* Arbitrary official action that inflicts damage takes liberty or property without due process of law. On this record, appellees' ruling is arbitrary because it is contrary to fact, because it is not authorized by law or Executive Order, because it has no tendency to benefit the public service, and because it was made without notice and hearing.

"A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense—a right to his day in court—are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him, to offer testimony, and to be represented by counsel." In re Oliver, 333 U.S. 257, 273, 68 S.Ct. 499, 507, 92 L.Ed. 682. These rights are not confined to proceedings in courts. In the Morgan case, which the Supreme Court cited as "among the multitude that support" the statement just quoted, the plaintiffs attacked an order of the Secretary of Agriculture fixing rates to be charged by market agencies. The Court said "the rudimentary requirements of fair play * * * demand 'a fair and open hearing'." Morgan v. United States, 304 U.S. 1, 14-15, 58 S.Ct. 773, 775, 82 L.Ed. 1129.

We were recently reminded that "due process of law has never been a term of fixed and invariable content. * * * The right of oral argument as a matter of procedural due process varies from case to case in accordance with differing circumstances, as do other procedural regulations." Federal Communications Commission v. WJR, The Goodwill Station, Inc., 337 U.S. 265, 69 S.Ct. 1097, 1103. "That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial." Betts v. Brady, 316 U.S. 455, 462, 62 S.Ct. 1252, 1256, 86 L.Ed. 1595. What is prac-

tically necessary may be reasonably fair, and what is reasonably fair may be due process. It is not practical to require a public official to hold a hearing before he makes a casual damaging statement. But it is neither fair nor necessary to enact and publish a defamatory permanent regulation restricting eligibility for public employment, restricting the freedom of government employees, and inflicting damage on many persons, without giving the accused group an opportunity to be heard in its defense. The same circumstances that make the Attorney General's investigation less than appropriate make it less than due process of law.

III. *Freedom of speech and assembly.* Read literally, the First Amendment of the Constitution forbids only *Congress* to abridge these freedoms. But as the due process clause of the Fourteenth Amendment extends the prohibition to all state action, the due process clause of the Fifth must extend it to all federal action.[7]

According to the complaint, appellant uses meetings and speakers in raising funds. Appellees' ruling, in its context, is a public warning that sympathetic association with appellant may cause government employees to be dismissed. It therefore puts government employees, present and prospective, under economic and social pressure not to support any of appellant's activities, verbally or otherwise, and in particular to stay away from appellant's meetings. In other words the ruling restricts the freedom of speech and assembly of government employees. According to the complaint, the ruling has deprived appellant of speakers and meeting places as well as supporters and funds. In other words it has restricted appellant's freedom of speech and assembly. To restrict appellant is to restrict the members who compose it.

The Supreme Court has repeatedly held that restrictions on freedom of expression are not valid in the absence of a clear and

---

we need not consider whether in our opinion the Order is valid; or whether the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq., (1948 Supp.), required a hearing.

7. This was implied in United Public Workers v. Mitchell, 330 U.S. 75, 94-95, 67 S.Ct. 556, 91 L.Ed. 754.

present danger.[8] There is no evidence of such a danger in this case. In the Mitchell case the Court held that "For regulation of employees it is not necessary that the act regulated be anything more than an act reasonably deemed by Congress to interfere with the efficiency of the public service."[9] But if appellant's purposes are truly stated in the complaint, sympathetic association with appellant cannot reasonably be deemed to interfere with the efficiency of the public service. It follows that if, as we must now assume, the complaint is true, the restraint imposed upon government employees, and not merely that imposed upon appellant and its members, is unconstitutional.

Executive power to control public employment stands on no higher constitutional ground than legislative power to tax. The taxing power does not extend to sales of propaganda not made for profit; license taxes, though imposed for the legitimate purpose of raising revenue, are unconstitutional in their application to such sales.[10] Such taxes, even if they are too small to be a "substantial clog"[11] on the circulation of propaganda, are "on their face * * * a restriction of the free exercise of those freedoms which are protected by the First Amendment."[12] The threat to reputation and livelihood that appellees' ruling imposes is on its face a greater restriction of the free exercise of those freedoms than the small license taxes the Supreme Court held void. It is a substantial clog. It is therefore more clearly unconstitutional than the taxes.

IV. *Standing to sue.* Appellant, an unincorporated association,[13] has standing to sue for the claimed injury to its reputation.[14]

Appellant has standing to sue for the claimed impairment of its freedom of speech and assembly.

Appellant has standing to sue for its claimed loss of contributions. Even a charity, which appellant claims to be, cannot operate without funds. In Pierce v. Society of Sisters private schools, some of them charitable, got relief because a state law requiring children to attend public schools caused the plaintiffs to lose tuition fees. "Their interest is clear and immediate, within the rule approved in Truax v. Raich * * * and many other cases where injunctions have issued to protect business enterprises against interference with the freedom of patrons or customers."

8. The Court reaffirmed this doctrine in Terminiello v. City of Chicago, 337 U.S. 1, 69 S.Ct. 894.

9. United Public Workers v. Mitchell, 330 U.S. 75, 101, 67 S.Ct. 556, 570, 91 L.Ed. 754. The Court upheld a particular restraint on the freedom of government employees to promote their political views but said, 330 U.S. at page 100, 67 S.Ct. at page 569: "Appellants urge that federal employees are protected by the Bill of Rights and that Congress may not 'enact a regulation providing that no Republican, Jew or Negro shall be appointed to federal office, or that no federal employee shall attend Mass or take any active part in missionary work.' None would deny such limitations on congressional power."

10. Jones v. City of Opelika, 319 U.S. 103, 63 S.Ct. 890, 87 L.Ed. 1290; Murdock v. Commonwealth of Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292, 146 A.L.R. 81; Busey v. District of Columbia, 319 U.S. 579, 63 S.Ct. 1277, 87 L.Ed. 1598; Busey v. District of Columbia, 78 U.S.App.D.C. 189, 138 F.2d 592.

11. Jones v. City of Opelika, 316 U.S. 584, 604, 62 S.Ct. 1231, 86 L.Ed. 1691, 141 A.L.R. 514. The dissent of Chief Justice Stone and the other dissents filed at the same time were afterwards adopted as opinions of the Court. Jones v. City of Opelika, 319 U.S. 103, 104, 63 S.Ct. 890, 87 L.Ed. 1290.

12. Murdock v. Commonwealth of Pennsylvania, 319 U.S. 105, 114, 63 S.Ct. 870, 875, 87 L.Ed. 1292, 146 A.L.R. 81.

13. An unincorporated association may sue in its common name. Busby et al. v. Electric Utilities Employees Union, 79 U.S.App.D.C. 336, 147 F.2d 865; Rule 17(b), Federal Rules Civil Procedure, 28 U.S.C.A.

14. Kirkman et al. v. Westchester Newspapers, 287 N.Y. 373, 39 N.E.2d 919. Cf. New York Society for the Suppression of Vice v. MacFadden Publications, 260 N.Y. 167, 183 N.E. 284, 86 A.L.R. 440.
It is too late to say that equity does not protect personal rights. Berrien v. Pollitzer, 83 U.S.App.D.C. 23, 165 F.2d 21.

Pierce v. Society of Sisters, 268 U.S. 510, 536, 45 S.Ct. 571, 574, 69 L.Ed. 1070, 39 A. L.R. 468. In Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131, L.R.A.1916D, 545, Ann.Cas.1917B, 283, enforcement of a state law restricting the right of employers to hire aliens but not the right of aliens to work for hire was enjoined at the suit of an alien. In Buchanan v. Warley, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149, L.R.A. 1918C, 210, Ann.Cas.1918A, 1201, an ordinance forbidding Negroes to move into white neighborhoods was set aside at the suit of a white man who wished to complete a sale to a Negro. In each case an unconstitutional interference with persons other than the plaintiff was enjoined because it put pressure on them to sever, or not to create, relations of value to him. Similarly the unconstitutional pressure of appellees' ruling upon present and prospective government servants has injured appellant by depriving it of contributions. Its relations with its contributors were terminable at will, but so were the relations involved in the Pierce and Truax cases.

Columbia Broadcasting System, Inc., v. United States, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563, is in some respects still closer to this case. The Columbia network sued to set aside a Communications Commission regulation against renewing the licenses of broadcasting stations that had certain kinds of contracts with networks. The regulation, like the one now in suit, did not command or forbid any action, either by the plaintiff or by the plaintiff's affiliates. The regulation was "addressed only to the Commission." 316 U.S.

at page 419, 62 S.Ct. at page 1201. But it injured Columbia by putting stations affiliated with Columbia to the sort of choice to which appellees' ruling puts government employees affiliated with appellant; the stations could cancel their contracts or lose their licenses, as the employees can cancel their affiliations or endanger their jobs. The Supreme Court held that Columbia had standing to sue. It said, 316 U.S. at pages 417, 418, 62 S.Ct. at page 1200: "The regulations are not any the less reviewable because their promulgation did not operate of their own force to deny or cancel a license. * * * The regulations are rules which in proceedings before the Commission·require it to reject and authorize it to cancel licenses on the grounds specified in the regulations without more." The regulation now in suit is a rule which authorizes dismissal of employees on the grounds specified in the Executive Order.

Threatened publication by government officers of damaging information about a plaintiff, even when its truth is conceded, gives him standing to test the propriety of the publication.[15] There would seem to be no less standing where, as here, truth is not conceded and continuance rather than the first occurrence of the publication is threatened.[16]

V. *Liability to suit.* "Under our constitutional system, certain rights are protected against governmental action and, if such rights are infringed by the actions of officers of the Government, * * * courts have the power to grant relief against those actions."[17] Equitable jurisdiction extends to cabinet officers.[18] The

15. Utah Fuel Co. v. National Bituminous Coal Commission, 306 U.S. 56, 59 S.Ct. 409, 83 L.Ed. 483; Bank of America National Trust and Savings Association v. Douglas, 70 App.D.C. 221, 105 F.2d 100, 123 A.L.R. 1266.

16. The question whether government employees whom the ruling threatens with dismissal have standing to sue for that reason, cf. United Public Workers v. Mitchell, supra note 9, is not before us, for no employees are suing. It does not appear that any of appellant's members are government employees, although the

complaint says appellant's "contributors" include "civil servants".

17. Larson v. Domestic & Foreign Commerce Corp., 1949, 69 S.Ct. 1457, 1468. Bell v. Hood, 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939; Land v. Dollar, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209; United States v. Lee, 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171.

18. Eg., Philadelphia Company v. Stimson, 223 U.S. 605, 32 S.Ct. 340, 56 L. Ed. 570; Ickes v. Fox, 300 U.S. 82, 96–97, 57 S.Ct. 412, 81 L.Ed. 525; Red Canyon Sheep Co. v. Ickes, 69 App.D. C. 27, 98 F.2d 308.

theory that an officer who is or claims to be executing an order of the President cannot be restrained would end due process of law and subject all life, liberty, and property to the will, or alleged will, of one man.

Cabinet officers are not liable in damages for statements made in connection with official duties, for they should be under no apprehension that personal harm might result from saying what they think they should say.[19] But their liability in equity causes no such apprehension. No claim for injunctive or declaratory relief, or that a regulation was invalid, was involved in the Spalding and Glass cases on which appellees rely. No claim for damages is involved in this case.

The rule of Standard Computing Scale Co. v. Farrell, 249 U.S. 571, 39 S.Ct. 380, 63 L.Ed. 780, that mere administrative advice cannot be reviewed by a court, is equally irrelevant here. Standard manufactured scales that did not agree with "specifications" published by a state Superintendent of Weights and Measures. Standard's bill to set aside the specifications was dismissed. No law or order required any inspector, purchasing officer, or other person to treat the specifications as correct; they were, 249 U.S. at page 574, 39 S.Ct. at page 381, "at most advisory." But Executive Order No. 9835 requires all loyalty boards to treat as correct appellees' ruling that appellant is subversive.[20] On March 9, 1948, the appellee Chairman of the Loyalty Review Board called this fact to the attention of all executive departments and agencies.[21]

19. "The head of a Department * * * cannot be held liable to a civil suit for damages on account of official communications made by him pursuant to an act of Congress, and in respect of matters within his authority * * *. In exercising the functions of his office, the head of an Executive Department, keeping within the limits of his authority, should not be under an apprehension that the motives that control his official conduct may at any time become the subject of inquiry in a civil suit for damages * * *." Spalding v. Vilas, 161 U.S. 483, 498, 16 S.Ct. 631, 637, 40 L.Ed. 780. Glass v. Ickes, 73 App.D.C. 3, 117 F.2d 273, 132 A.L.R. 1328, certiorari denied 311 U.S. 718, 61 S.Ct. 441, 85 L. Ed. 468, followed Spalding v. Vilas.

20. Cf. Shields v. Utah Idaho Central R. Co., 305 U.S. 177, 182–184, 59 S.Ct. 160, 83 L.Ed. 111.

Additional differences between the Standard Computing Scale case and the present one are (1) it was not even alleged there, and is admitted here, that the defendants acted without giving the plaintiff notice or hearing; (2) the complaint there was not dismissed until evidence had been taken, and this included proof that the specifications were "the result of prolonged investigation and extensive experimentation"; (3) the specifications did not name the plaintiff but were "generic"; (4) no question of freedom of speech or assembly was involved.

Although the evidence, if any, of unreasonable or arbitrary action was obviously weak in the Standard Computing Scale case the Court said: "If the

'specifications' had been issued as a regulation, that is, a law, we might have been called upon to enquire whether it was a proper exercise of the police power, or was, as plaintiff contends, void, because arbitrary and unreasonable." Standard Computing Scale Co. v. Farrell, 249 U.S. 571, 577, 39 S.Ct. 380, 382, 63 L.Ed. 780.

21. Two paragraphs of his Memorandum No. 2, which is addressed "To All Executive Departments and Agencies", follow:

"Since the loyalty program is being conducted under the authority of the executive order, and since the President under such order has constituted the Attorney General the agency for the creation and submission of a list of groups or organizations of the nature defined in Part V, subdivision f, of the executive order, the determination as to the nature of such organizations thus made by the Attorney General under the authority and direction of the President, must be accepted by all Boards for the purpose of all hearings and determinations under the loyalty program.

"Boards, therefore, should not enter upon any evidential investigation of the nature of any of the organizations identified in the Attorney General's list, for the purpose of attacking, contradicting, or modifying the controlling conclusion reached by the Attorney General in such list. Any and all questions proposed with respect to the merits or appropriateness of the inclusion of a particular organization in such list would, therefore, be for the Attorney General to decide, and not for the Board, and the

Employers Group of Motor Freight Carriers v. National War Labor Board, 79 U. S.App.D.C. 105, 143 F.2d 145, certiorari denied 323 U.S. 735, 65 S.Ct. 72, 89 L.Ed. 589, applied the rule of the Standard Computing Scale case. We declined to set aside a "directive order" that amounted only to a statement that the Board thought the Carriers should grant certain wage increases. The Board's views were not enforceable against anybody,[22] were not defamatory, and caused no loss. The ruling now in suit is defamatory; unless it is set aside, it is enforceable against appellant's supporters who are government employees; and it has caused loss.

Appellees' ruling is said to be a mere matter of internal management. Even in such matters the Constitution governs.[23] But there was nothing internal about the publication of the ruling. It was chiefly this publication that injured the appellant and its members and restricted the freedom of government employees. The right to hire and fire is not a right to broadcast statements that appellant, and so the members who compose it, are criminals or that they are subversive.

If the assertions of fact in the complaint are true the appellees' ruling is contrary to fact, unauthorized, and unconstitutional, and the appellant is entitled to relief against the appellees. The judgment dismissing the complaint should therefore be reversed.

Board should permit no evidence or argument before it on the point."

22. The Carriers suggested that the Board might notify the President of the plaintiffs' noncompliance with the Board's views and the President might take possession of the plaintiffs' property. But nothing the Board could say to the President could determine whether the Carriers should grant the proposed wage increases, or whether their property should be seized, or any other question.

The President had full authority under his war powers to take possession of the plaintiffs' property or not to do so, whether or not he agreed with the Board's views, whether or not the Carriers complied with the Board's views, and whether or not the Board reported to the President. Any action the Board might take would therefore be merely advisory.

23. Cf. United Public Workers v. Mitchell, supra note 9.